Michelle WATSON–SPARGO, Claimant/Appellant,

v.

TREASURER OF the STATE of Missouri, CUSTODIAN OF SECOND INJURY FUND, Respondent.

No. SD 31547.

Missouri Court of Appeals,
Southern District,
Division Two.

June 27, 2012.

Randy C. Alberhasky, Springfield, MO, for Appellant.

Chris Koster, Attorney General, Cara L. Harris, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

DANIEL E. SCOTT, Judge.

Michelle Watson–Spargo ("Claimant"), who sought workers compensation for permanent total disability (PTD), was awarded only permanent partial disability benefits. She appeals.

## Background

Claimant has some college education, but no degree, and was 38 years old at the time of her hearing. She held various jobs, suffered several injuries and maladies, and experienced a family tragedy during the 20 years leading up to her 2009 work injury at D & W Stateline Restaurant. After Claimant settled with D & W, she sought PTD benefits from the Second Injury Fund, which compensates an injured employee whose latest work injury combines with a prior disability to create an increased combined disability. *See Proffer v. Federal Mogul Corp.*, 341 S.W.3d 184, 186 n. 3 (Mo.App.2011).

Claimant's experts (Koprivica and Franks) opined that Claimant was totally disabled. The ALJ deemed a contrary opinion by the Fund's vocational expert (Swearingin) "more credible and accurate" and, thus, found Claimant only partially disabled.

■ The Labor and Industrial Relations Commission adopted the ALJ's decision by a 2–1 vote, so we review and defer to the ALJ's findings, weighing of evidence, and credibility determinations. *Id.* at 187. It was Claimant's burden to prove that she was totally disabled. *Dunn v. Treasurer*, 272 S.W.3d 267, 275 (Mo.App.2008).

## Point and Analysis

Our review is limited to issues raised by the point relied on. *Bland v. IMCO Recycling, Inc.*, 67 S.W.3d 673, 681 (Mo.App. 2002). Claimant's point asserts that the ALJ erroneously found Claimant employable on two grounds: (1) Swearingin was the most credible expert; and (2) because Claimant "didn't have 'surgical findings in her low back,'" she could not be totally disabled.[1] We consider these in reverse order.

### No Surgical Findings

The award dispels Claimant's suggestion that her PTD claim was rejected exclusively or primarily because she never needed back surgery:

In this case, there is ample evidence to support a finding that Claimant is capable of working in the open labor market, albeit in a limited number of jobs. Contrary to Dr. Franks' understanding of Claimant's prior work at Air Evac, Claimant was working in a full-time dispatcher position while also working on-call as an EMT. She held that position for nearly four years. By her own testimony, at the time she left she was capable of performing her job both

---

1. Specifically, Claimant contends that no competent and sufficient evidence supports these findings. We have questioned whether evidence must support a decision against a claimant who had the burden of proof. *See Reynolds–Byers v. Blue Cross and Blue Shield of Missouri*, 290 S.W.3d 781, 783 n. 3 (Mo. App.2009).

psychologically and physically. Dr. Franks' assertion that Claimant was not dependable or was a bad employee is simply incorrect and cannot stand as a basis for finding that Claimant is now permanently and totally disabled.

There is no doubt that Claimant has not had the easiest of lives. But she has proven to be resilient, rebounding from traumatic events of her childhood, obtaining an education, completing vocational training, maintaining her license as an EMT, and successfully working many years in a demanding position, as well as maintaining employment through most of her life.

Wilbur Swearingin had the opportunity to meet and give testing to Claimant. He is an expert in vocational rehabilitation and had a full understanding of Claimant's past work history, medical history, and physical restrictions. Based on his expertise, he determined that Claimant was capable of employment in the open labor market. While Claimant counters with Dr. Franks' opinion, it is evident that Dr. Franks did not have an accurate understanding of Claimant's past work history, and thus I find and conclude that he exaggerated Claimant's past psychological history.

Mr. Swearingin's opinions are the only ones in the case which are based upon a full and accurate understanding of the underlying facts in this case. I accept Mr. Swearingin's opinion, that Claimant is not permanently and totally disabled, as more credible and accurate than that of Dr. Franks and Dr. Koprivica. Given Claimant's age of only 38 years, her education, medical skill, skill in dispatching, and lack of surgical findings in her low back, and based on the record as a whole, I find and conclude that Claimant is not permanently and totally disabled.

However, the last-quoted paragraph also speaks to Claimant's other complaint, to which we now turn.

### Credibility of Experts/Alexander Rule

■ Claimant criticizes the ALJ for believing Swearingin over Claimant's experts on the total disability issue. She claims the ALJ partially misunderstood Franks and that Koprivica's opinion was "unimpeached." The record leaves us dubious of both assertions;[2] more importantly, Claimant offers no authority for her request that we dissect and reweigh the ALJ's express credibility determination.

The ALJ noted several issues and weaknesses in the testimony of both Koprivica[3]

---

**2.** We are not convinced that any misunderstanding about Claimant's Air Evac work schedule and Franks' related testimony was with the ALJ, not Franks. Koprivica's disability opinion plainly *was* challenged. Further, even if that opinion was unimpeached, the ALJ did not have to believe it. *See Alexander v. D.L. Sitton Motor Lines*, 851 S.W.2d 525, 527 (Mo. banc 1993) and discussion *infra*. Disability is not an exclusively medical question. *Carkeek v. Treasurer*, 352 S.W.3d 604, 610 n. 3 (Mo.App.2011).

**3.** Per the award:

Dr. Koprivica admitted that he had no records showing that any medical provider had placed any physical limitations on Claimant's activities prior to the January 16, 2009, injury. He admitted that Claimant clearly had not had surgery to her neck or back, nor any recommendation for surgery, prior to the injury in January 2009. He admitted that he had no record of Claimant having been hospitalized for her low back prior to January 2009. He admitted that Claimant's neck and back were neurologically intact prior to January 2009. He admitted that Claimant had no surgery, nor any recommendation for surgery, related to her carpal tunnel syndrome prior to January 2009. He admitted that he did not have actual medical records to confirm what Claimant had told him regarding the types and amounts of medication she was taking prior to January 2009. He believed that psychological factors played a role in

and Franks.[4] Without repeating those, and as quoted above, the ALJ expressly "accept[ed] Mr. Swearingin's opinion, that Claimant is not permanently and totally disabled, as more credible and accurate than that of Dr. Franks and Dr. Koprivica." Given the "Alexander rule," we are not free to disregard this credibility determination. *See Alexander v. D.L. Sitton Motor Lines,* 851 S.W.2d 525, 527 (Mo. banc 1993);[5] *Dunn,* 272 S.W.3d at 272–75; *Richardson v. Missouri State Treasurer,* 254 S.W.3d 242, 244–45 (Mo.App.2008); *Copeland v. Thurman Stout, Inc.,* 204 S.W.3d 737, 743–44 (Mo.App.2006).

*Richardson* is instructive. A vocational expert and one physician opined that Richardson was unemployable. "Dr. Randolph; however, concluded Richardson was capable of employment with restrictions." 254 S.W.3d at 245. The Commission sided with the latter, finding the vocational expert's opinion "flawed to the extent [it] fails to take into consideration all of the expert medical opinions in the matter relating to work restrictions." *Id.*

Citing the Alexander rule, *id.* at 244, the Eastern District affirmed. Despite "some concern" with the Commission's choice of words, the court did not believe "the commission was silent regarding the credibility of the expert testimony. Instead, the commission appears to have concluded Dr. Randolph's testimony was more credible or 'persuasive.' " *Id.* at 245.

[W]e are faced with contradictory testimony and a determination that one ex-

---

his examination of Employee. For instance, Claimant was unable to lie flat on her back during examination but Dr. Koprivica found no physical reason for her inability to lie down flat. He also believed that Claimant was over-reacting on his exam, but linked that to Claimant's psychological issues. Dr. Koprivica agreed that Claimant's psychological condition had deteriorated since the work injury in January 2009.

4. The award continues:

On cross-examination, Dr. Franks admitted that despite Claimant's early life of traumatic events, she graduated from high school, obtained 12 hours of college credit, graduated from an EMT program, obtained the EMT license.

Dr. Franks thought Claimant had only worked part-time for Air Evac as a dispatcher (by his own testimony a very stressful position). Claimant had actually worked 36 hours per week at the Air Evac job, plus worked simultaneously as an EMT.

Although Dr. Franks indicated that Claimant did not perform well on her jobs, he admitted he had no employment records. He had no history that she missed work. Dr. Franks' only evidence of Claimant having difficulty concentrating prior to January 26, 2009, was that she was involved in two car accidents. But he did not know who was at fault in those accidents and it was possible that the accidents were not caused by focus problems. He had no evidence from either his interview with Claimant or the records he reviewed that Claimant had productivity problems, or had problems making sound decisions prior to the January 2009 accident. Even though Dr. Franks believed Claimant had problems with coworkers and supervisors, he admitted that Claimant told him that she made friends easily. He inferred that Claimant had difficulties due to short periods of employment, but he had failed to acknowledge in his report that Claimant's short-term jobs might be seasonal, temporary, or that she had more than one job at a time.

Dr. Franks testified that he had not seen the results of the tests administered by Wilbur Swearingin, the Second Injury Fund's vocational expert. He was unaware that Claimant had scored at a high school level or above on most of the WRAT–IV. He admitted he had seen no cognitive limitations in Claimant. He did believe that if Claimant could find employment it would benefit her psychologically. He admitted that Claimant's psychological outlook worsened significantly since her January 16, 2009, accident.

5. Statutorily abrogated in other respects; *see Ahern v. P & H, LLC,* 254 S.W.3d 129, 136 (Mo.App.2008).

pert opinion is more "persuasive" than the other based upon the evidence in the record as a whole. Therefore, we must follow the rule set forth in *Alexander*, and leave the acceptance or rejection of medical evidence for the commission.

*Id.*

We also "are faced with contradictory testimony and a determination that one expert opinion is more 'persuasive' than the other based upon the evidence in the record as a whole," *id.*, so we also must follow *Alexander*. We are constitutionally bound to follow the most recent controlling decision of our supreme court. *Bennett v. Treasurer*, 271 S.W.3d 49, 52 n. 4 (Mo.App. 2008).

Indeed, by citing specific weaknesses in the Koprivica/Franks testimony, this ALJ arguably made an even stronger case for deference. At any rate, "[b]ecause the record is not 'wholly silent concerning the Commission's weighing of credibility' the *Alexander* rule applies." *Copeland*, 204 S.W.3d at 744 (quoting *Houston v. Roadway Express, Inc.*, 133 S.W.3d 173, 179–80 (Mo.App.2004)).

### Conclusion

Claimant's sole point fails. With that, our inquiry ends. *Bland*, 67 S.W.3d at 681. The degree of Claimant's disability was "a finding of fact within the special province of the Industrial Commission." *Pavia v. Smitty's Supermarket*, 118 S.W.3d 228, 234 (Mo.App.2003). We will not substitute our judgment on such issues, even if we would have reached a different conclusion. *Id.* at 239. The ALJ could consider all the evidence, not just medical testimony, in determining Claimant's disability. *Id.* We affirm the award as entered.

ROBERT S. BARNEY, J., concurs.

WILLIAM W. FRANCIS, JR., P.J., dissents, in separate opinion.

WILLIAM W. FRANCIS, JR., Judge, dissenting.

I respectfully dissent. I would reverse the award of the Commission and award permanent total disability benefits to Appellant ("Spargo") based upon the combination effect of her injuries.

The majority opinion interprets Spargo's point relied on too narrowly and, in my opinion, excludes much of the argument that flows from her point relied on, and is expounded on in the argument section of her brief, as well as during oral argument. In fact, counsel for the Second Injury Fund (the "Fund") also conceded at oral argument that this case turned on whether there was competent and substantial evidence to support the award. I choose to more fully address Spargo's claims of error in this dissenting opinion.

The majority opinion reduces Spargo's claim of error to a credibility issue reserved solely for determination by the Commission. While generally deference must be given to the Commission's credibility findings, here, the Commission's cited reasons for discrediting the testimony of clinical psychologist Dr. Kent Franks ("Dr. Franks") were not supported by competent and substantial evidence. It is erroneous to extend this deference when the Commission's credibility determinations are based upon unsupported and flawed reasoning. Additionally, the majority opinion concludes the "Alexander rule" applies because this Court is "faced with contradictory testimony and a determination that one expert opinion is more 'persuasive' than the other based upon the evidence in the record as a whole"; however, this conclusion ignores the fact that there was no contradictory testimony re-

garding whether any reasonable employer would be expected to hire Spargo in her present condition. Wilbur Swearingin ("Mr. Swearingin"), a certified rehabilitation counselor, wholly failed to address that critical question; whereas, Dr. P. Brent Koprivica's ("Dr. Koprivica") testimony was unequivocal that it was "unrealistic that any ordinary employer would employ her." In my review of the record, I find no evidence to contradict Dr. Koprivica's testimony that no responsible employer would employ Spargo. As discussed in more depth below, Mr. Swearingin's testimony only concluded she was *capable* of limited employment and was silent as to whether any employer would reasonably be expected to hire her given her present condition and thus, by relying on Mr. Swearingin's testimony, the Commission's decision failed to reach the critical determination.

This case should not be neatly disposed of by over-simplifying and separating each of the errors. Rather, our standard of review directs this Court that "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* In this case, a detailed review of the facts is required to explain why the award is not supported by sufficient competent and substantial evidence.

From 2000 to 2002, Spargo worked for D & W as a cook and waitress. Spargo first left employment with D & W in February 2002, following the onset of depression caused by the death of her infant son.

Spargo was hospitalized at Ozark Medical Center for mental health issues and was diagnosed with major depression, recurrent severe without psychosis; complicated bereavement; amphetamine dependence, sustained in complete remission since 2000; cannabis dependence; and continuous alcohol abuse. She was discharged with medications—Prozac, Ativan, Wellbutrin and trazodone. Spargo continued to work at D & W off and on until her on-the-job injury in 2009.

From 2004 to 2007, Spargo worked as a dispatcher for Air Evac Life Team, and as an emergency medical technician ("EMT") for Oregon County.

In 2006, Spargo rolled a vehicle injuring her neck and back and underwent a lumbar MRI that revealed multi-level disk disease with various disk protrusions and bulges from T11–S1.[1]

On April 20, 2007, Spargo fell while standing on a chair on her porch. An x-ray of the lumbar spine was suggestive of lower lumbar stenosis with multi-level degenerative disk disease. Spargo continued to have right radicular symptoms and a lumbar spine MRI revealed a central to right paracentral disk protrusion at T12–L1, a right-sided disk protrusion at L1–L2, bilateral protrusions at L4–L5, and a right posterolateral protrusion at L5–S1.

Spargo's carpal tunnel "really got severe" during her employment at Air Evac causing nocturnal awakening as a result of numbness in her hands.

In June 2007, Spargo was terminated from the dispatcher's job due to problems getting along with her colleagues. Spargo had two "confrontations" with one colleague in particular—the last confrontation involved an error in dispatching a helicop-

---

1. When referring to the cervical, thoracic, lumbar, and sacral sections of the spine in this opinion, the medical abbreviations used are "C," "T," "L," and "S," respectively.

ter resulting in Spargo's termination. Spargo considered the dispatcher job to be "one of the most stressful jobs [she] ever worked." She often wondered if she "could handle it."

Spargo was unemployed for a few months, then filled in as a temporary mail carrier for three weeks but had to quit due to problems with her carpal tunnel syndrome. Spargo then worked for a home respiratory care company but was fired after eleven days because she was not "learning the job fast enough. . . ."

Due to continued complaints of neck pain, Spargo underwent an x-ray on December 3, 2007, which revealed minimal degenerative disk narrowing at C6–7, and on December 5, 2007, underwent an MRI which revealed minor disk bulging at C5–6.

In 2008 Spargo returned to work at D & W where on January 16, 2009, she suffered the present on-the-job injury to her back. Spargo indicated the pain was so severe that she went to the doctor and was taken off work. Her pain medications were increased, and she was switched from Norco to Percocet.

X-rays of the cervical spine, thoracic spine, and lumbar spine showed minor calcification at C6–7, degenerative disk disease of the thoracic spine, and minor scoliosis of the lumbar spine. An MRI scan revealed mild to moderate kyphosis in the thoracic region. Surgery was not recommended.

Dr. Koprivica examined Spargo at the request of her attorney. He was the only medical doctor who was a witness. Dr. Koprivica opined that prior to the work injury of January 16, 2009, Spargo had "profound pre-existent industrial disability[.]" He found Spargo had a history of chronic pain syndrome, involving psychological factors and physical impairments; polysubstance abuse; major de-

pression; chronic cervical pain; symptomatic bilateral carpal tunnel syndrome; and "overwhelming disabling" back pain. Dr. Koprivica testified there was objective evidence of disability to Spargo's back and neck prior to the January 2009 injury. Dr. Koprivica testified that Spargo's pre-existing depression impacted her ability to function in the workplace. The depression was also associated with her development of chronic pain syndrome. Dr. Koprivica stated that an individual who is depressed has difficulty with work production, presenting to work, interacting with co-workers, and dealing with the psychological stresses inherent in the workplace.

Dr. Koprivica outlined how Spargo's use of medications negatively impacted her ability to work before the accident, and substantially worsened after the accident. Spargo was on Norco prior to the injury of January 2009. After that injury, Spargo had to go to stronger narcotics such as methadone and oxycodone. Dr. Koprivica explained Norco was on the same level of narcotics as codeine or hydrocodone, and even though people claim these drugs do not impact performance, concentration, physical capabilities and coordination, they are impacted negatively by these drugs. Dr. Koprivica testified that physiologic capabilities are reduced as the potency of the narcotic goes up. He indicated: "It's sort of like going from drinking one or two beers to drinking a case of beer, in how you function." Dr. Koprivica testified that these types of narcotics are sedating, addicting, and adversely affect coordination.

Dr. Koprivica testified that one cannot objectively conclude that lack of surgical intervention is evidence of a lack of severe disability, especially where psychological factors are involved. He further explained that surgical recommendations are made when there are structural changes that can

be altered positively, but "when you have multi-level disease like [Spargo] has, the outcome of surgery is so unpredictable that the disabling situation actually oftentimes is worse...."

Dr. Koprivica testified the studies done in May 2007 on Spargo's upper extremities showed bilateral carpal tunnel syndrome. This impacted Spargo's function in that it limited her repetitive-hand use, including repetitive pinching, grasping, or any tasks where you repetitively flex or extend your wrists. Dr. Koprivica explained it was an obstacle to doing work that is hand-intensive like assembly work and extensive typing, and that it would be a significant obstacle to Spargo's re-employment. Dr. Koprivica testified you would also have a "combined effect from an industrial disability" in that the MRI of December 5, 2007, showed mild disk bulging at C5–6 and that carpal tunnel arises from the C5–6 nerve root level. Dr. Koprivica testified when a disability in the neck area and in the hand area are combined, it creates even more disability because of the "double crush phenomenon."[2]

Dr. Koprivica testified there was objective evidence of injury to Spargo's neck and back following her work-related accident on January 16, 2009, as evidenced by changes in the February 2, 2009, and March 11, 2009, MRIs.

Dr. Koprivica identified Spargo's pre-existing industrial disabilities to be her chronic neck pain, with disk disease at the C5–6 level; bilateral carpal tunnel syndrome; and severe disability in the lumbar region. He placed numerous restrictions on Spargo based on those conditions. Dr. Koprivica concluded Spargo was limited physically to light physical demands even

before she suffered further injury. Dr. Koprivica testified Spargo's pre-existing industrial disabilities were: (1) 15 percent permanent partial disability to the body as a whole for her chronic neck pain; (2) 25 percent permanent partial disability to the body as a whole for her multi-level disk disease in the low back; and (3) 15 percent permanent partial disability of the right hand at the 175–week level (wrist), and 15 percent permanent partial disability of the left hand at the 175–week level (wrist) for her bilateral carpal tunnel syndrome.

Dr. Koprivica stated that the January 16, 2009 accident was the prevailing factor in causing additional disability, and he assigned to Spargo an additional 10 percent permanent partial disability to the body as a whole. Dr. Koprivica testified that as a result of the January 2009 injury, he added additional restrictions for Spargo. Dr. Koprivica testified that the January 2009 injury alone did not result in Spargo being able to do less than sedentary physical demand, but rather the combination of the further aggravating injury reduced Spargo's physical capabilities. Dr. Koprivica testified to numerous additional restrictions due to her total presentation. In general, Dr. Koprivica recommended captive sitting intervals of an hour or less, standing intervals of less than an hour, and walking intervals of less than thirty minutes. Dr. Koprivica also opined that the amount of narcotics Spargo was taking would limit her ability to perform work.

Without addressing any psychological disability, Dr. Koprivica testified that Spargo was unemployable in the open labor market because of physical disabilities based on the impact of combining her disabilities that predated the injury of Janu-

---

**2.** Dr. Koprivica explained that "double crush phenomenon" means that because of potential involvement of the nerve root in the neck, and then there is compression at the wrist level on the median nerve, the dysfunction of that nerve is enhanced or greater than simply adding the two together.

ary 2009, with the additional disabilities attributed to the January 2009 injury. Dr. Koprivica testified that Spargo's restrictions present at this point, were so severe that he believed it was "unrealistic that any ordinary employer would employ her." He stated Spargo's restriction of less than sedentary physical demands eliminated a majority of the open labor market. However, adding postural limitations—which are difficult to predict or accommodate in terms of sitting, standing and walking—and the narcotics Spargo was taking, affected her ability to be productive and even reliably present to work. Dr. Koprivica testified that Spargo should not drive while taking the narcotics.

Dr. Koprivica explained simply adding the relative levels of disability would not total 100 percent disability. However, he felt that the impact of how severe Spargo was limited from the multiple body parts involved—limitations in terms of her upper extremities, limitations in her neck area that cannot be accommodated by her low back because of the limitations in the low back, limitations in the low back which cannot be accommodated because of the neck, and then also add an inability to squat, crawl, kneel, and limit standing and walking capabilities—the synergism from that is what results in the total disability. Dr. Koprivica also touched on Spargo's inability to deal with pain as part of her chronic pain syndrome disorder, and that her pain was magnified by her inability to cope.

During cross examination by the Fund, Dr. Koprivica indicated he had taken into consideration Spargo's past experience as a dispatcher and that if she had a job where she would be able to sit and stand as needed, while utilizing the equipment provided to her, i.e., the phones, computers, etc., she might physically be able to do that job. However, Dr. Koprivica testified his main concern was safety due to the type of narcotics Spargo takes and whether or not she would be a good candidate for that type of work. He further testified that emergency dispatchers have to be very good at assessing situations and dealing with them in terms of verbal communication, and he was not sure Spargo would be a candidate if she was on methadone. The Fund's attorney even agreed stating: "I think that's very reasonable, Doctor. I'd have to agree with that. I don't know if I would want to call her if she was on it."

Dr. Franks examined Spargo and testified at the hearing. In reaching his opinions, he reviewed Spargo's medical and psychiatric records, conducted a five-to-six hour clinical interview, and administered a series of psychological tests. Dr. Franks' August 6, 2010 report, summarized a long complex history of psychiatric problems both before and after January 16, 2009, and detailed Spargo's depression and how her pain worsened her depression. Dr. Franks found Spargo's physical and psychological condition had deteriorated post-injury.

Dr. Franks testified that because of Spargo's physical and psychological condition, she would be prone to mistakes, would fatigue easily, have more absences from work, and her reliability in general would be diminished. Dr. Franks testified that Spargo would be unable to do the dispatcher job at the present time. He agreed he had not reviewed employment records from Air Evac but based on his examination of Spargo, and his review of her psychiatric records, it was his opinion that while working as a dispatcher there, Spargo worked at a reduced level of efficiency and was probably a below-average employee due to her psychological condition.

Dr. Franks testified Spargo's final diagnosis was "[m]ajor depression, recurrent,

and pain disorder associated with psychological and physical conditions." Dr. Franks opined that while Spargo was not totally and permanently disabled from a psychological standpoint, she was severely depressed and suffered from constant pain. He indicated Spargo's pain increased in connection with psychological discomfort and situation stressors. Dr. Franks concluded Spargo suffered a "25 percent overall psychological disability, 10 percent of which was attributable to the January 2009 injury, 15 percent of which was pre-existing."

Mr. Swearingin performed a vocational exam of Spargo on behalf of the Fund. He opined Spargo was restricted to "less than a full range of Sedentary Work" and could not perform her past relevant work, with the exception of being a dispatcher, where she had been physically accommodated. Mr. Swearingin agreed there would be few occupations which would fall within her capability. However, Mr. Swearingin opined that Spargo's best opportunity for gainful employment was the work she previously performed as a dispatcher because that employer had made accommodations by providing a desk which automatically elevated and permitted the dispatcher to work from either a sitting or standing position.

Mr. Swearingin was first deposed prior to Dr. Frank's psychological evaluation. He admitted that the dispatcher job was the only employer of a similar nature in the West Plains area. When asked whether the narcotics Spargo took would preclude her from working as a dispatcher for an emergency medical response unit, Mr. Swearingin opined it would be somewhat dependent upon Spargo as she seemed to have developed a tolerance to those narcotics, although he is not a medical doctor. Mr. Swearingin testified that at his evaluation with Spargo, she was not sleepy and did well on her testing, but "that kind of medication certainly can be a consideration." Mr. Swearingin agreed that many employers have a policy against narcotic drug use and that, combined with Spargo's difficulty in sitting for long periods of time, would make it difficult for her to return to school to be retrained.

Mr. Swearingin testified that in assessing Spargo, he did not take into account any disability or restrictions Spargo had for depression or pain disorder. He admitted psychological issues are not addressed in the Occupational Access System ("OASYS")[3] analysis of jobs. Mr. Swearingin refused to acknowledge that work as an EMT or emergency dispatcher was stressful. He stated it "[d]epends on how you make it." He admitted he did not ask Spargo whether it was stressful for her.

In a supplemental deposition, Mr. Swearingin testified that work as an emergency responder required "little to no error[,]" and "these are jobs that you are the person who is potentially saving someone's life, or on the other hand, you can do things that can cause someone's death." Mr. Swearingin reaffirmed his opinion that Spargo was still employable in a "narrow" range of jobs. Mr. Swearingin acknowledged that Spargo's employment record deteriorated after she was fired from the dispatcher job; that pain disorders do cause concentration problems; and that jobs Spargo might be able to do required interaction with the public or co-workers, which was contrary to Dr. Franks' recommendation. Mr. Swearingin conceded that if Spargo could not work well with others, then she would be permanently and totally

---

**3.** Job-matching software used by vocational rehabilitation counselors to assist in matching a person's skills, work history, and interests with occupations. It is based on the U.S. Department of Labor's *Dictionary of Occupational Titles*.

disabled. Mr. Swearingin did not indicate in his report or testimony that an employer would reasonably be expected to hire Spargo in her current physical condition.

The Administrative Law Judge ("ALJ") awarded Spargo only permanent partial disability benefits. The Commission affirmed the award of the ALJ and incorporated the findings into the Commission's award, with one dissenting opinion.[4]

Spargo contends the Commission erred in finding Spargo employable in the open labor market in that the Commission's findings that Mr. Swearingin was the most credible expert to the exclusion of Dr. Franks and Dr. Koprivica was not supported by competent and substantial evidence, and because the lack of a surgical condition is not a rational basis for finding employability in the open labor market. For purposes of our standard of review in this case, only section 287.495.1(4) is applicable—we may modify, reverse, remand for rehearing, or set aside the award if there was not sufficient competent and substantial evidence to warrant the making of the award based on an examination of the whole record.[5] *Hampton*, 121 S.W.3d at 223.

Pursuant to section 287.020.6, the term "total disability" means the "inability to return to any employment and not merely inability to return to the employment in which the employee was engaged at the time of the accident."

> The test for permanent total disability is whether the worker is able to compete in the open labor market. The critical question is whether, in the ordinary course of business, any employer reasonably would be expected to hire the injured worker, given [her] present physical condition.

*Molder v. Missouri State Treasurer*, 342 S.W.3d 406, 411 (Mo.App. W.D.2011) (internal quotation and citations omitted). "Total disability" does not require the employee be completely inactive or inert, rather, it means the inability to return to any reasonable or normal employment. *Lewis v. Kansas Univ. Med. Ctr.*, 356 S.W.3d 796, 800 (Mo.App. W.D.2011).

The Commission relied heavily on Mr. Swearingin's testimony in concluding Spargo was not permanently and totally disabled—Mr. Swearingin is neither a medical doctor, nor a psychologist. The Commission concluded: "Mr. Swearingin's opinions are the only ones in the case which are based upon a full and accurate understanding of the underlying facts in this case." The Commission accepted Mr. Swearingin's opinion that Spargo is not permanently and totally disabled as more credible and accurate than that of Dr. Franks and Dr. Koprivica. After a review of the record, however, I find these conclusions to be against the weight of the evidence and thus not supported by sufficient competent evidence for a number of reasons.

Mr. Swearingin testified that there were clearly hindrances to Spargo's employment and her attendance at school on a full-time basis including the effects of her medications and physical limitations. He concluded that there were a small number of jobs that Spargo was *capable* of performing in the open labor market. Mr. Swearingin, while acknowledging Spargo is only employable in a narrow range of jobs, continually explained that Spargo's "best

---

4. Findings of the ALJ adopted by the Commission and incorporated into the Commission's decision are reviewed by the appellate court as the findings of the Commission. *Sell v.*

*Ozarks Med. Ctr.*, 333 S.W.3d 498, 505 (Mo. App. S.D.2011).

5. All references to statutes are to RSMo 2008, unless otherwise indicated.

opportunity for gainful employment" was the work she previously performed as a dispatcher because the employer had already made workplace accommodations. Mr. Swearingin described this job as Spargo's "best choice" and "practically ... perfect." Mr. Swearingin's opinion, however, is undermined in light of the evidence that Spargo was *fired* from this position and takes even heavier doses of narcotics after her 2009 injury. Dr. Koprivica's expert medical testimony was that an employee taking heavy doses of narcotics is not the best candidate for handling emergency dispatch calls. Dr. Koprivica·explained the narcotics Spargo was taking after the 2009 injury negatively impacted performance, concentration, physical capabilities, and coordination. Mr. Swearingin, however, relied simply on his non-medical expert opinion, based on his personal impression of Spargo when she was in his office, to conclude Spargo seemed to have developed a tolerance to the narcotics she was taking. Despite these serious flaws in Mr. Swearingin's testimony, the Commission relied heavily on his testimony.

It is noteworthy to point out that Mr. Swearingin's report and opinions do not contain any conclusion that an employer would reasonably be expected to *hire* Spargo in her current physical condition. That is the key test which the Commission did not, and could not, apply. *See Molder,* 342 S.W.3d at 411. The record is *completely absent* of evidence that an employer would be expected to hire Spargo given her present condition. In fact, given her disabilities, depression, and narcotic usage, it is difficult to believe any employer would hire her in her current condition.

The Commission specifically concluded that "Dr. Franks did not have an accurate understanding of [Spargo]'s past work history" and thus, concluded that Dr. Franks exaggerated Spargo's past psychological history. The Commission noted: "Contrary to Dr. Franks' understanding of [Spargo]'s prior work at Air Evac, [Spargo] was working in a full-time dispatcher position while also working on-call as an EMT." The Commission's finding, however, that Dr. Franks did not understand Spargo's past work history is contrary to the evidence. Spargo testified multiple times that she averaged 36 hours a week with Air Evac. The confusion appears to arise from how each person characterized Spargo's employment status—while she was only working on average 36 hours per week for Air Evac, she was also working a separate job as an EMT. Additionally, Spargo testified that the shifts were set up such that she would often take six shifts on and then six shifts off in order to accommodate both jobs. However, Spargo testified that 36 hours would be the most she would spend dispatching in a week, and the rest, up to 40 hours or more, would be made up doing the EMT work. Dr. Franks clarified that he stated Spargo worked "part-time" as a dispatcher because "it was not a 40 hour per week job." When further asked why he described her work as part-time, he explained: "The only point I wanted to make is that her job duties were not entirely dispatching." Dr. Franks' characterization of Spargo's employment as a dispatcher as being part-time is consistent with Spargo's testimony in light of his acknowledgment that he characterized it this way because it was less than 40 hours a week. Thus, the Commission's conclusion discrediting Dr. Franks' testimony based on his alleged misunderstanding of Spargo's weekly hours as a dispatcher is not supported by the evidence.

Additionally, the Commission noted that according to Spargo's own testimony, "at the time she left [Air Evac] she was capable of performing her job both psychologically and physically. Dr. Franks' asser-

tion that [Spargo] was not dependable or was a bad employee is simply incorrect and cannot stand for finding that [Spargo] is now permanently and totally disabled." These conclusions by the Commission are also inconsistent in light of the record before us. Again, it is *undisputed* that Spargo was *fired* from her job at Air Evac because of interpersonal problems and an error in dispatching a helicopter. Further, Spargo lost a subsequent job after only two weeks because she "was not learning the job fast enough...." Dr. Franks opined, "The fact that she lost the two jobs within a close time frame because of performance issues suggests that she has had difficulty focusing." Thus, the Commission's conclusions discrediting Dr. Franks' testimony are against the overwhelming weight of the evidence and thus, not supported by competent and substantial evidence.[6]

While the Commission also found Mr. Swearingin's opinion that Spargo is not permanently and totally disabled more credible than Dr. Koprivica's opinion to the contrary, the record demonstrates that Dr. Koprivica's specific testimony that no reasonable employer would be expected to hire Spargo given her present condition was not contradicted, impeached, or disputed by other testimony, including Mr. Swearingin's. While some of Dr. Koprivica's findings were challenged on cross examination by the Fund, there was no com-

peting evidence submitted on this issue. Again, Mr. Swearingin's testimony did not address the dispositive issue in this case. Dr. Koprivica, however, clearly did. In this case, the Commission may not arbitrarily disregard and ignore the uncontradicted medical opinions of Dr. Koprivica. While the Commission provided some explanation for discounting Dr. Franks' opinions, as discussed above, the Commission found Dr. Koprivica less credible but without explanation. "The evaluation of medical testimony concerning a claimant's disability is within the peculiar expertise of the Commission, and, as such, the Commission is free to disbelieve the testimony of the claimant's medical expert." *Tombaugh v. Treasurer of State,* 347 S.W.3d 670, 675 (Mo.App. W.D.2011). "However, if the record is silent as to whether the Commission actually made the determination to disbelieve an expert medical witness with regard to a medical issue, the Commission may not *arbitrarily* disregard the *uncontradicted, unimpeached,* and *undisputed* testimony of that witness."[7] *Id.* (emphasis in original). Here, the Commission is silent as to any tenable reason to disbelieve Dr. Koprivica's medical testimony.

In this case, the only medical doctor to testify, Dr. Koprivica, concluded that Spargo was permanently and totally disabled based upon a combination effect of all of

6. This conclusion by the Commission focuses on Spargo's psychological and physical capabilities *prior* to her 2009 injury and ignores the effects of her increase in medication and physical limitations following her 2009 injury.

7. If the Commission expressly declared that it disbelieves uncontradicted or unimpeached testimony, or if reference to the award shows that the Commission's disbelief of the employee or his or her doctor was the basis of the award, then the general rule that the Commission is free to disbelieve uncontradicted and unimpeached testimony applies.

*Cardwell v. Treasurer of State of Missouri,* 249 S.W.3d 902, 907 (Mo.App. E.D.2008) (internal citations omitted).

> The Commission may not arbitrarily disregard and ignore competent, substantial, and undisputed evidence of witnesses who are not shown by the record to have been impeached and the Commission may not base its findings upon conjecture or its own mere personal opinion unsupported by sufficient and competent evidence.

*Id.*

her injuries. He described, from a medical perspective, her problem of working while taking her medications and compared it to the equivalent of drinking a case of beer a day. These conclusions alone make it difficult to conclude that an employer would reasonably be expected to hire Spargo in her current physical condition.

Compounding these errors is the fact that the Commission applied the wrong test for determining permanent and total disability. The Commission concluded "there is ample evidence to support a finding that [Spargo] is capable of working in the open labor market, albeit in a limited number of jobs." The Commission's decision, however, wholly fails to explain whether any employer reasonably would be expected to hire Spargo, given her present physical condition. *See Molder*, 342 S.W.3d at 411. Instead, the Commission's rationale focused on Spargo's past ability to perform her job as a dispatcher, and Mr. Swearingin's testimony that Spargo is *capable* of employment. Significantly, Mr. Swearingin failed to explain how any employer would reasonably be expected to hire Spargo given her numerous limitations. Again, the "critical question is whether, in the ordinary course of business, any employer reasonably would be expected to hire the injured worker, given [her] present physical condition." *Id.* When the appropriate test is applied, I find it nearly impossible not to conclude Spargo is permanently and totally disabled.

Finally, the Commission based its conclusion that Spargo was not permanently and totally disabled, in part, on the "lack of surgical findings in her lower back[.]" Dr. Koprivica, however, testified that there is no objective correlation between the lack of a surgical condition and disability, and

that issue was conceded by the Fund in oral argument.

In light of the numerous unsupported conclusions made by the Commission, I would find insufficient competent and substantial evidence to support the award. When examining the record as a whole, it is difficult to conclude any reasonable employer would be expected to hire Spargo with her physical limitations. That is the central issue the Commission should have appropriately addressed. I would reverse the decision of the Commission and enter an award of permanent and total disability against the Fund.