Melynda SCHUSSLER, Appellant,

v.

TREASURER OF the STATE of Missouri–CUSTODIAN OF the SECOND INJURY FUND, Respondent.

No. WD 74596.

Missouri Court of Appeals, Western District.

Nov. 13, 2012.

---

Steffanie Stracke, Kansas City, MO, for Appellant.

Kimberley Fournier, Kansas City, MO, for Respondent.

Before: JAMES EDWARD WELSH, C.J., THOMAS H. NEWTON, J., and CHARLES E. ATWELL, Sp. J.

THOMAS H. NEWTON, Judge.

Ms. Melynda Schussler appeals the Labor and Industrial Relations Commission's (Commission) decision denying permanent and total disability benefits from the Second Injury Fund (Fund). The Commission determined that the Fund was not liable because Ms. Schussler was permanently and totally disabled before suffering an injury while working for Step Ahead, LLC ("Employer"), a day care center. We affirm.

### Factual and Procedural Background

Ms. Schussler sought compensation from Employer and the Fund for injury and disability she alleged was incurred in the course and scope of her employment with Employer, whom she worked for from 2006 through June of 2008. In December 2010, the parties appeared before an Administrative Law Judge (ALJ) on Ms. Schussler's claim. Ms. Schussler testified at the hearing; Dr. P. Brent Koprivica and Ms. Mary Titterington, a vocational expert, testified by deposition.

The evidence demonstrated that Ms. Schussler had suffered a number of disabling conditions prior to her work injury. In high school and again in adulthood, Ms. Schussler suffered knee injuries that required surgeries on both knees; she suffered continuous problems with bending, kneeling, and stooping. While in her twenties, Ms. Schussler suffered spinal injury from a sledding accident; she crushed vertebrae in her spine, neck, mid and lower back and had ongoing pain and back problems as a result. In 1996, she was involved in a motorcycle accident that resulted in "cervical and thoracic fractures" and contributed to the chronic neck, mid- and low-back pain.

In 1992, Ms. Schussler was diagnosed with "brittle" type one diabetes, which caused severe swings in blood sugar levels and reactions such as headaches, dizziness, incoherence, shakiness, nausea, vomiting, sweating, thirst, frequent urination, and sometimes passing out. She experienced these symptoms from four to five times a week to as frequently as three times a day. She required three to seven daily shots of insulin, but she testified at times, "[i]t was even up to 13 shots a day." Ongoing problems from her diabetes also included painful nerve damage, kidney insufficiency, vision problems, gastroparesis, and bone weakness that caused her to "have broken and fractured both of [her] feet ... three times." One to two times a year, on average, Ms. Schussler had to be hospitalized for three to six days for diabetes-related problems. As Ms. Schussler described, when her blood sugars were high, she experienced "constantly leaving [her work] position to go to the bathroom, to get drinks, to try to take insulin to lower the blood sugar, keep retesting." When her blood sugar was low, she was required "to stop. [She had] to eat, drink and just sit still for like 15 minutes and not do things

in order for [her] blood sugar to come back up." She was also diagnosed with Hepatitis C and had a history of depression and post-traumatic stress disorder.

Ms. Schussler's employment history prior to working for Employer was varied, but typically, her positions were short-term, lasting less than a year. She had a four-year position from 1996 to 2000 working for her boyfriend's auto repair shop as an office manager and because of the relationship, she received accommodation for her diabetes. In other positions, the need to manage her diabetes caused her to be reprimanded for leaving her work unattended or falling behind, and when she worked at a fast-food restaurant in 2002, which required exertion during four to six hour shifts, managing her diabetes caused her to lose the job. In February 2005, Ms. Schussler applied for social security disability. The basis of the application was "diabetes mellitus, hypertension, fatigue and depression." However, total disability was not awarded.

During 2005, Ms. Schussler volunteered for Employer, whose owner was a friend from church. In September 2006, she began working for Employer as an office manager, whom she testified was more accommodating and understanding of the diabetes, although still reprimanding her for missing deadlines.

In 2007, Ms. Schussler fell asleep while driving to work and flipped her vehicle. The auto accident caused further injury to Ms. Schussler's back, which resulted in the need for a "fusion with instrumentation from the base of her skull to her mid back" and for her to miss work for two months.

Ms. Schussler eventually returned to working five to seven hours a day. However, she required pain medication, had daily headaches, and needed to lie down regularly to relieve pain, which Employer allowed during breaks. Issues from the diabetes and the car accident required her to go to doctor's appointments two to three times a month, which Employer characterized as excessive. After the accident, Ms. Schussler had a more difficult time meeting deadlines because of the pain.

Beginning in March 2008, Ms. Schussler started to experience symptoms of bilateral carpal tunnel syndrome, which she initially thought was related to her diabetes. After determining the source of the pain, Ms. Schussler advised Employer she had a work injury. A week later, Employer discharged her. She subsequently underwent two surgeries for the carpal tunnel, and was released for work without restriction in April 2009. However, at the time of the disability hearing, she reported suffering carpal tunnel symptoms on a daily basis. Prior to the hearing, Employer and Ms. Schussler settled on compensation for temporary total disability and fifteen percent permanent partial disability.

At hearing, Ms. Schussler testified that she continued to need a muscle relaxer and a painkiller on an almost daily basis, in addition to five to six medications for her diabetes and medication for depression. She was limited to sitting without pain for 30 minutes to an hour, standing for fifteen minutes, and walking for twenty to thirty minutes. She stated that she had been unable to obtain work, except for sitting with a woman with cancer twice a week and occasional sporadic work making phone calls for a friend's Mary Kay business. She testified that while sitting with the woman, she rested in a recliner. She stated that she had difficulty with sitting, holding her hands up to write or type, standing, reaching, and bending, and also experienced extreme fatigue.

Dr. Koprivica testified that he determined that Ms. Schussler was permanently and totally disabled based on a combina-

tion of the 2008 carpal tunnel and her pre-existing conditions. He assigned a "27-and-a-half percent permanent partial disability" for the carpal tunnel. He believed that prior to June 2008, there was "a significant industrial disability." He determined the residual from her "cervicotharacic fusion" resulted in a 25 permanent partial disability; her "thoracolumbar injury" and chronic back pain resulted in a "12-and-a-half percent permanent partial disability"; and her diabetes mellitus and its systemic complications resulted in a 25 percent permanent partial disability. He then determined that combining all the disabilities resulted in an "enhancement" and "synergism," which precluded Ms. Schussler from accessing the open labor market, resulting in permanent total disability, and that she was permanently disabled when she was released from treatment for the carpal tunnel.

Ms. Titterington testified that she believed Ms. Schussler was not employable on the open labor market. She based her opinion on the combination of Ms. Schussler's "functioning and her dexterity, her ability to sit, stand, walk, use her cervical neck and her cervical area." Because of the results of Ms. Schussler's intelligence testing, she did not believe vocational retraining would offer success; the jobs Ms. Schussler would qualify for would not be available because of her physical condition. She testified that needing to lie down is an unacceptable work practice in most situations. Ms. Titterington highlighted that at Employer's, the focus was that Ms. Schussler completed her tasks and she was given discretion as to how to accomplish them.

Ms. Titterington further stated that she did not believe Ms. Schussler was employable "from all the restrictions that are in Dr. Koprivica's report even if we take out the hand injuries," while noting a "cross-over" because the pre-existing conditions included trouble with her upper extremities, such as with carrying and reaching. Ms. Titterington's report itself opines that Ms. Schussler had "multiple pre-existing physical and emotional impairments" that were "severe enough to affect her employment on and off throughout her life." In her summary, she opined that Ms. Schussler "was able to return to work" after the three level back fusion following the 2007 car accident, but the "combination of her limited dexterity, overall limited functioning, decreased general learning ability and her constant pain" precludes her from being employable in the open labor market. Ms. Titterington further stated that Ms Schussler "cannot meet the essential characteristics of work, including the ability to report to work on a consistent basis, stay on task and meet production goals [and] also reports significant difficulty with emotional liability."

The ALJ denied a benefits award to Ms. Schussler from the Fund because it determined she was permanently and totally disabled prior to the carpal tunnel work injury in 2008. The ALJ found that although Dr. Koprivica determined Ms. Schussler was permanently disabled based on the "combination of her primary and pre-existing conditions," it was required to "look at the standard of employability in making its determination of benefits." It found the only expert as to the "standard of employability" was Ms. Titterington, that Ms. Titterington's opinion was credible and substantial, and that therefore the substantial and credible evidence indicated that Ms. Schussler was not employable on the open market prior to her carpal tunnel work injury. It found Ms. Titterington's inability to separate out restrictions for Ms. Schussler based on her prior conditions from restrictions resulting from the carpal tunnel was the "most critical evidence ... in determining that [Ms. Schus-

sler] was unemployable before 2008." It further noted that prior to working for Employer, the positions Ms. Schussler had been able to obtain appeared to have been heavily accommodated and that she "suffered tremendous bodily injury" from the 2007 auto accident. Consequently, it found the Fund was not liable because Ms. Schussler was permanently and totally disabled prior to her injury while working for Employer because her "multitude of physical problems" made her unable to compete in the open labor market.

Ms. Schussler appealed to the Commission. The Commission agreed with the ALJ's finding that Ms. Schussler was unable to compete in the open labor market prior to her work injury and affirmed that the Fund was not liable for the payment of compensation. Ms. Schussler appeals.

### Standard of Review

On appeal of a workers' compensation case, we may modify the decision, reverse, remand, or set the award aside only on the grounds that:

> the commission acted without or in excess of its powers; (2) That the award was procured by fraud; (3) That the facts found by the commission do not support the award; (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

*Molder v. Mo. State Treasurer*, 342 S.W.3d 406, 409 (Mo.App. W.D.2011) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003)).[1] To determine whether the Commission's decision was supported by competent and substantial evidence, we review the evidence in light of the entire record. *Id.* We are bound by the Commission's factual determinations and thus defer to its findings of credibility. *Id.* "An award is supported by competent and substantial evidence unless it is against the overwhelming weight of the evidence." *Carkeek v. Treasurer of State–Custodian of Second Injury Fund*, 352 S.W.3d 604, 608 (Mo.App. W.D.2011). It is the claimant's burden to prove entitlement to the award. *Watson–Spargo v. Treasurer of State, Custodian of Second Injury Fund*, 370 S.W.3d 292, 293 n. 1 (Mo.App. S.D.2012).

### Legal Analysis

On appeal, Ms. Schussler contends that the Commission's decision is not supported by sufficient competent evidence because: (1) the ALJ failed to make determinations as to the percentages of her permanent partial disabilities as required by section 287.220(1); and (2) the Commission ignored all medical testimony in violation of *Angus v. Second Injury Fund*, 328 S.W.3d 294, 303 (Mo.App. W.D.2010). We consider Ms. Schussler's points in reverse order.

### *Determination of Disability*

In her second point, Ms. Schussler argues that the Commission erred in denying her benefits because the Commission ignored the only medical testimony. She further argues that the vocational expert deferred to the medical expert.

"The Second Injury Fund compensates injured workers who are permanently and totally disabled by a combination of past disabilities and a primary work injury."

---

1. *Hampton v. Big Boy Steel Erection* clarified the proper standard of review, and in so doing, overruled a large number of cases. *See* 121 S.W.3d 220, 223 (Mo. banc 2003). We follow the approach of *Angus v. Second Injury Fund* in our use of cases decided prior to *Hampton* and "cite and rely on several such cases in this opinion for legal propositions unrelated to the standard of review, without further notation." *See* 328 S.W.3d 294, 297 n. 1 (Mo.App. W.D.2010).

*Carkeek*, 352 S.W.3d at 608 (internal quotation marks and citation omitted). The fund was established to encourage the hiring of individuals with disabilities. *Angus*, 328 S.W.3d at 303. It relieves an employer, or its insurer, from responsibility for an employee's pre-existing disabilities by limiting the employer's liability to only injuries suffered by the employee while working for that particular employer. *Id.*

■ "The test for permanent total disability is whether the worker is able to compete in the open labor market." *Carkeek*, 352 S.W.3d at 608. A worker is totally disabled if they are unable to return to any normal or reasonable employment; the worker is not required to be inert or completely inactive. *Id.* The key question is whether any employer in the ordinary course of business would reasonably be expected to hire the worker in his or her current physical condition. *Id.*

■ Ms. Schussler argues that the Commission erred because the sole medical evidence of disability was Dr. Koprivica's testimony and Dr. Koprivica testified that she was permanently and totally disabled as a result of her combined injuries. It is true that the Commission may not reject uncontradicted medical testimony in favor of the ALJ's opinion on the issue of medical causation. *See Angus*, 328 S.W.3d at 300. However, the extent of an employee's disability, and thus employability, is a not an issue of medical causation, nor does it exclusively require medical testimony. *Carkeek*, 352 S.W.3d at 610 n. 3.

■ Employability is held to be a matter within the commission's expertise. *Lewis v. Kan. Univ. Med. Ctr.*, 356 S.W.3d 796, 802 (Mo.App. W.D.2011). "The extent and percentage of disability is a finding of fact within the special province of the Industrial Commission." *Id.* As a result, in determining the degree of a claim-

ant's disability, the Commission "need not rely exclusively on the testimony of medical experts; rather, it may consider all the evidence and the reasonable inferences drawn from that evidence." *Carkeek*, 352 S.W.3d at 610 n. 3. Thus, in *Watson–Spargo*, the ALJ's decision to accept the opinion of the Fund's vocational expert as to employability over the opinions of the claimant's doctor and psychologist was upheld on appeal because the decision was based on a credibility decision. 370 S.W.3d at 295–96. In *Carkeek*, the ALJ was able to substitute its own determination of the claimant's employability based on the evidence in place of the opinion of the vocational expert. 352 S.W.3d at 610.

■ "An award is supported by competent and substantial evidence unless it is against the overwhelming weight of the evidence." *Id.* at 608. The Commission's finding that Ms. Schussler was permanently and totally disabled prior to employment with Employer was not against the overwhelming weight of the evidence. Although Ms. Schussler argues that Ms. Titterington waivers in her opinion and also defers to the medical evidence, the Commission is free to believe or disbelieve testimony, even if the testimony is internally inconsistent. *Id.* at 610.

Further, Dr. Koprivica's opinion was not in direct contradiction with Ms. Titterington's opinion. Dr. Koprivica agreed that Ms. Schussler was permanently and totally disabled. He found that Ms. Schussler's spinal injuries to her neck and back and her diabetes, which all occurred prior to the carpal tunnel, were "industrially disabling." Dr. Koprivica testified that Ms. Schussler's medication regime started prior to the carpal tunnel, and that though she had impairment from the carpal tunnel, it was not severe. He further noted that because of her "repeat hypoglycemic episodes," she was not able to sustain em-

ployment, and that prior to the carpal tunnel, she was "accommodated in her work and allowed to recline." His report characterized this as "extreme accommodation." Further, in his report, Dr. Koprivica recommended a formal vocational evaluation. He testified that he felt Ms. Titterington's conclusions were consistent with his opinions.

██ Finally, that Ms. Schussler maintained employment with Employer does not bar a finding that she was permanently and totally disabled. "Missouri courts have made clear that the Commission is not prevented from finding that a claimant is permanently and totally disabled simply because he or she holds limited, sporadic and/or highly accommodated employment." *Molder,* 342 S.W.3d at 412. A claimant's "good fortune in obtaining work other than through competition" does not preclude a finding of total disability. *Cooper v. Med. Ctr. of Independence,* 955 S.W.2d 570, 575 (Mo.App. W.D.1997) (internal quotation marks and citation omitted). Such an approach would penalize attempts by the disabled to self-support. *Molder,* 342 S.W.3d at 412. Rather, the test is whether the claimant could compete in the open labor market. *See Cooper,* 955 S.W.2d at 575. Certainly, the fact that Employer discharged Ms. Schussler almost immediately after learning of her carpal tunnel suggests that even the friendship had reached its limits and her employment was tenuous. "We will not substitute our judgment on issues of fact where the Commission was within its powers, even if we would arrive at a different initial conclusion." *Molder,* 342 S.W.3d at 409 (internal quotation marks and citation omitted). Thus, on this record, we cannot determine that the Commission's finding that Ms. Schussler was unable to compete in the open labor market prior to her carpal tunnel was against the overwhelming weight of the evidence. Ms. Schussler's second point is denied.

### Methodology for Calculation of Disability

In her first point on appeal, Ms. Schussler argues that the Commission erred because section 287.220.1 required the ALJ to make findings (1) as to whether Ms. Schussler sustained occupational injury while working for Employer, and to what percent that injury disabled her; and (2) "the combined effect of that disability with her pre-existing disability." She argues that if the Commission "had followed the steps of § 287.220(1) as required the only conclusion which can be reached is that [Ms. Schussler] is permanently and totally disabled due to the combination of her disability from the injury and her pre-existing disabilities."

Section 287.220 provides the methodology for calculating disability where permanent disability results and there was a previous disability. *Kizior v. Trans World Airlines,* 5 S.W.3d 195, 200 (Mo.App. W.D. 1999). As described in *Kizior,* there are four steps in calculating the employee's compensation and the source of liability:

> The employer's liability is considered in isolation—"the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability;" (2) Next, the degree or percentage of the employee's disability attributable to all injuries existing at the time of the accident is considered; (3) The degree or percentage of disability existing prior to the last injury, combined with the disability resulting from the last injury, considered alone, is deducted from the combined disability; and (4) The balance becomes the responsibility of the Second Injury Fund

5 S.W.3d at 200. Ms. Schussler argues the Commission failed to follow these steps.

 For the Second Injury Fund to be liable, the claimant's preexisting disability and disability from a subsequent injury must combine in one of two ways: "(1) the two disabilities combined result in a greater overall disability than that which would have resulted from the new injury alone and of itself; or (2) the preexisting disability combined with the disability from the subsequent injury to create permanent total disability." *Uhlir v. Farmer*, 94 S.W.3d 441, 444 (Mo.App. E.D.2003). We do not believe, as Ms. Schussler argues, that the Commission is required to follow the methodology for calculating benefits within section 287.220.1 where neither of these conditions exist because the claimant was already permanently and totally disabled, as is the case here.

The section sets forth the situations to which it applies. Prior to listing additional criteria for liability for a claimant's permanent partial or permanent total disability, the section states that:

> All cases of permanent disability where there has been previous disability shall be compensated as herein provided. Compensation shall be computed on the basis of the average earnings at the time of the last injury. *If any employee who has a preexisting permanent partial disability* whether from compensable injury or otherwise, of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed . . . .

§ 287.220 (emphasis added). By the section's plain language, it applies to a claimant who has a "preexisting permanent *partial* disability," not to claimants who are already permanently and totally disabled. Consequently, the Commission was not required to apply the methodology of section

287.220. Ms. Schussler's first point is denied.

### Conclusion

For the foregoing reasons, we affirm the Commission's award.

WELSH, C.J., and ATWELL, Sp. J. concur.