

# Missouri Court of Appeals

### Southern District

### Division Two

| | | |
|---|---|---|
| CAROLYN MARTHA BRASHERS, | ) | |
| | ) | |
| Claimant-Respondent, | ) | |
| | ) | |
| v. | ) | No. SD32872 |
| | ) | |
| TREASURER OF THE STATE OF | ) | **Filed: July 22, 2014** |
| MISSOURI AS CUSTODIAN OF | ) | |
| THE SECOND INJURY FUND, | ) | |
| | ) | |
| Respondent-Appellant. | ) | |

### APPEAL FROM THE LABOR AND
### INDUSTRIAL RELATIONS COMMISSION

### **AFFIRMED**

The Treasurer of the State of Missouri as Custodian for the Second Injury Fund

("the Fund") appeals the award of the Labor and Industrial Relations Commission ("the

Commission") that found Carolyn Martha Brashers ("Claimant") entitled to receive

permanent, total disability benefits from the Fund. Claimant was working as a bus

monitor for Springfield Public Schools ("SPS") when she was injured in a fall at work on

January 8, 2009 ("the work injury").

The Fund first contends that the award was not supported by substantial and

competent evidence based on the Commission's finding that Claimant was "only

permanently and partially disabled prior to the work injury" because the whole record

shows that Claimant was already permanently and totally disabled ("PTD") at the time

she suffered the work injury.  Alternatively, the Fund claims that if the Commission correctly found that Claimant's earlier continued employment constituted evidence that she was not PTD before the work injury, then Claimant was not rendered PTD by "a combination of [the] work injury . . . and her preexisting disabilities" because she "returned to her regular job" following the work injury.

Finding no merit in either assertion, we affirm.

### Governing Law and Applicable Principles of Review

> For the Second Injury Fund to be liable, the claimant's preexisting disability and disability from a subsequent injury must combine in one of two ways:  "(1) the two disabilities combined result in a greater overall disability than that which would have resulted from the new injury alone and of itself; or (2) the preexisting disability combined with the disability from the subsequent injury to create permanent total disability."

*Schussler v. Treasurer of State-Custodian of Second Injury Fund,* 393 S.W.3d 90, 98 (Mo. App. W.D. 2012) (quoting *Uhlir v. Farmer*, 94 S.W.3d 441, 444 (Mo. App. E.D. 2003)), *overruled on other grounds by Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 and 224 (Mo. banc 2003)[1]; s*ee also* section 287.220.1.[2]

The language of the statute "applies to a claimant who has a 'preexisting permanent *partial* disability,' not to claimants who are already [PTD]." *Schussler*, 393 S.W.3d at 98.  "The determination of whether a claimant is [PTD] is based upon the claimant's ability to compete in the open labor market[,]" *Blackshear v. Adecco*, 420 S.W.3d 678, 681 (Mo. App. E.D. 2014), and "[w]hen [a claimant] became PTD [is] a fact issue within the special province of the Commission." *Stewart v. Zweifel*, 419 S.W.3d 915, 917 (Mo. App. S.D. 2014) (citing *Schussler*, 393 S.W3d at 96).

---

[1] Additional cases overruled on other grounds by *Hampton* are cited, *infra*, but no further citation to *Hampton* in that regard will be noted.
[2] Unless otherwise indicated, all statutory references are to RSMo 2000.

Article V, section 18 of the Missouri Constitution provides that we review the Commission's award to determine whether the award is "supported by competent and substantial evidence upon the whole record." *See also* **Hampton**, 121 S.W.3d at 222. "This court will not disturb the decision of the Commission on appeal unless it acted without or beyond its power, the award was procured by fraud, the facts do not support the award, or the award is not supported by sufficient competent evidence in the record." **Palmentere Bros. Cartage Serv. v. Wright**, 410 S.W.3d 685, 691 (Mo. App. W.D. 2013); *see also* section 287.495.1. "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record. An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." **Hampton**, 121 S.W.3d at 223. "When the record can support either of two opposed fact findings, the Commission's determination binds this court." **Stewart**, 419 S.W.3d at 917.

The Fund agrees that "[t]he question before this Court is one of a factual nature[.]" As a result, we "determine whether the Commission reasonably could have made its findings and reached its result based upon all of the evidence before it." **Fitzwater v. Dept. of Pub. Safety**, 198 S.W.3d 623, 627 (Mo. App. W.D. 2006). "In making this determination, [w]e do not reweigh the evidence; the Commission is the judge of the weight to be given to conflicting evidence and the credibility of the witnesses." **Palmentere**, 410 S.W.3d at 691 (internal quotation and citation omitted).

**Facts and Procedural Background**

The evidence consisted of a joint factual stipulation that was read into the record by the Administrative Law Judge ("ALJ"), plus exhibits consisting of depositions, medical records, and other documents.

*Relevant Stipulated Facts*

Claimant was working for SPS "subject to the Missouri Workers' Compensation Law" at the time of the work injury, and the work injury "arose out of and in the course and scope of employment." "[C]laimant reached maximum medical improvement on December 12, 2009[.]"

*Other Submitted Evidence*

*1. Claimant's Deposition Testimony*

Claimant provided the following testimony. In 1992, Claimant applied for (and eventually received) Social Security benefits based upon disability associated with "Moyamoya" -- a condition which caused strokes, followed by seizures and balance problems. Before the work injury, Claimant had undergone various surgeries, including "a neck surgery and fusion[,]" "carpal tunnel releases on both . . . hands[,]" "a rotator cuff repair on [her] right shoulder[,]" "arthroscopic surgeries" on both knees, and one knee replacement. Claimant described various medical conditions that she had in addition to Moyamoya, including depression, bilateral ulnar neuropathy, osteoarthritis, and fibromyalgia.

Claimant was not employed again until sometime around 2006-2007, when she went to work for a dress shop, where she worked eight hours per week "at the most." Hanging clothes and pinning pants on hangers caused her some pain, but she ultimately

4

left the job because she was not "getting enough hours, and . . . [she] learned that the . . . school system was hiring."

Before going to work for SPS in March 2007, Claimant was "limited in . . . repetitive upper extremity activities" and in pinching and grasping; she had difficulty with crawling and squatting; she could kneel only with a cushion beneath her knees; and she had difficulty climbing stairs. Because of these limitations, and the fact that she could not tolerate prolonged standing and walking, Claimant was "limited to a sedentary type job[.]"

As a bus monitor, Claimant rode with special needs children and assisted them while they were on the bus. Bus monitors where given a choice as to the number of routes that they wished to work. Between March 2007 and May 2007, she worked about six-and-a-half hours per day, and she had breaks between the morning, noon, and afternoon routes. Claimant testified that during summer school in 2007, she worked four hours a day. In August 2007, she eliminated her noon route because it was "too hard" on her, and this change left her working approximately 4-5 hours per day on the morning and afternoon bus routes.

Claimant said the work injury occurred when she was walking toward a student and "tripped over an uneven sidewalk, and . . . went down face first." The fall left her with a broken nose and tooth, and it also hurt her low back. As a result of the work injury, Claimant "cannot sit for very long periods of time, and [she has] trouble walking." The trouble "starts in [her] lower back, [her] sciatic, and it goes down both [of her] legs, and [her] legs and feet get numb." Claimant volunteered that her "own doctor, Dr. Wong," did not recommend further treatment for her numbness and said "that it's

5

deterioration of [her] back, [her] spine. It's arthritis." Claimant did not have the pain running from her low back to her feet or the numbness in her feet before the work injury.

In February 2009, Claimant returned to work at SPS on "light duty" in the office, and she returned to her work on a bus the following month, working about five hours a day. Claimant did not work that summer because she "was starting to hurt." She also had another knee replacement that summer. Claimant returned to work six weeks after the knee replacement.

Claimant recalled that when she went back for the 2009-2010 school year, she "was hurting a lot more than what [she] had before[,]" and she was "having trouble getting on and off the bus[.]" Claimant "was really having trouble sitting on the bus, and whenever [she would] take steps down to get off the bus . . . [she felt] like [her legs] were going to go out from underneath [her]." She had pain that started in her low back and went down both hips to both feet. Her legs and feet would "go numb with the pain." Claimant said she "was starting to hurt very, very bad with fibromyalgia and degenerative bones in [her] back, [and] in [her] hips. It was just getting harder and harder for [her] to do" her job.

At the time of her deposition (June 2010), Claimant was able to sit for about 30 minutes before needing to stand up. Before the work injury, she "was able to sit for the whole two hours on the bus."

Claimant was "terminated" by SPS in December 2009. Her understanding was that SPS had received a report from "Dr. Koprivica" that "said that [she] was not employable and that [she] should not be employed." She had intended to work until the

end of that school year and then not work anymore. Claimant had not worked after her job at SPS ended, and she had no plans to get another job.

*2. Stipulation for Compromise Settlement with SPS*

A "Stipulation for Compromise Settlement" executed by Claimant and attorneys for Claimant and SPS was received into evidence. It stated that the settlement between those parties was "based upon approximate disability of 12.5% of the body as a whole."

*3. Medical Evidence from Dr. Koprivica*

Dr. Preston Brent Koprivica's testimony on behalf of Claimant via deposition was received into evidence, along with his written report labeled as deposition "Exhibit 2." In his report, Dr. Koprivica stated that he personally evaluated Claimant in August 2009, and he also reviewed her medical records. Dr. Koprivica's physical examination included having Claimant do a "straight leg raise" in both seated and supine postures, "and it produced sciatica on the left." Dr. Koprivica understood that Claimant's disability as to the work injury "was compromised at 12 and 1/2 percent permanent partial disability to the body as a whole, but [he] assigned 15 percent" to this cause. He described Claimant's pre-existing disabilities as "profound," and he rated the combination of them at "75 percent permanent partial disability to the body as a whole." Dr. Koprivica opined that Claimant "realistically could not work" at the time that he examined her.

Dr. Koprivica acknowledged that while the records reflected that Claimant had complained of pain down her leg at a physical therapy session on January 21, 2009, some other notes had not described such pain, and one note indicated that she reported her pain level at a 1 out of 10. He pointed out, however, that some of her treatment records were "not very detailed[.]" Dr. Koprivica did not find sciatica noted in the records, but he

7

noted some pain descriptions that Claimant had provided after the work injury, such as "'[s]harp stabbing down buttocks and reports sharp radiating pain down bilateral posterior thigh regions above the knee[,]'" which he regarded as "sciatica-like" complaints. Dr. Koprivica agreed that a record from Claimant's neurologist, Dr. Wong, noted that Claimant did not have tingling or pain in her leg at a January 14, 2009 visit. Dr. Koprivica also conceded that the medical records indicated that a physical exam by "Dr. Bisbey" showed Claimant's back to be normal, and Dr. Bisbey released her to return to work at "full duty." The record indicated that Claimant's "[n]euro [was] intact[,]" meaning "there's no sciatica or neurologic complaints into the lower extremities[,]" and it stated that Claimant was "doing quite well[.]"

Dr. Koprivica's findings were "quite different" when he saw Claimant in August 2009. Dr. Koprivica opined that Claimant's "preexisting disabilities combined with the [work injury] to create a disability greater than their sum[.]" He agreed that before the work injury, Claimant was "limited to sedentary physical demand work" with some restrictions. Dr. Koprivica conceded that it was "possible" that if he had seen Claimant in 2005, his "opinion would have been that she was [PTD]" at that time.

### 4. Medical Evidence from Dr. Parmet

Dr. Allen Parmet's deposition was admitted into evidence on behalf of the Fund, and his written report was included as deposition "Exhibit 2." Dr. Parmet reviewed Claimant's records, but he did not personally interview or examine her. Dr. Parmet opined that in Claimant's work at SPS, "[s]he was functioning at a sedentary level with accommodations and on a part-time basis." He did not believe that "she was capable of working at a sedentary level full time" because she started part-time and reduced her

8

hours from there. Dr. Parmet opined that before the work injury, Claimant was already PTD and her preexisting disabilities totaled greater than 100%.

Dr. Parmet further testified that Claimant's medical records documented that she had complained of pain in both legs and "chronic low back pain for quite a long time." He said that an April 2007 MRI revealed disk tears and protrusions. Dr. Parmet testified that Claimant's records demonstrated that her "chronic low back pain . . . . was exacerbated after the [work] injury" but returned "to her baseline" after February. Dr. Parmet did not believe that the work injury resulted in "any additional permanent disability" and did not "contribute in any fashion to [Claimant's] current physical condition[.]"

### 5. *Rehabilitation Evidence from Mr. Lala*

The deposition of Michael Lala, a "certified rehabilitation counselor[,]" was admitted into evidence on behalf of Claimant. The deposition included a copy of Mr. Lala's written report, which was marked as deposition "Exhibit 2." Mr. Lala met with Claimant in July 2010 to assess her employability in the open labor market. He also received her medical records and a copy of her deposition. Mr. Lala testified that "the gold standard" for doing his evaluation includes a "face-to-face interview . . . between the vocational rehabilitation counselor and the injured worker." He conceded that he had prepared evaluations in the past that did not include such a face-to-face meeting, and he felt that he had enough information in those situations to render an opinion.

Based upon his interview and review of the documentation, Mr. Lala opined that Claimant is "now [PTD]." He agreed "that since the [work injury] and because of the problems [Claimant] has from that injury that she's no longer able to even do that job

[working as a bus monitor], and that's why [he] now [found] her [PTD.]" He also opined that before the work injury, "when she was working as a school bus monitor," he did not "think she was [PTD]." Mr. Lala also testified that Claimant's job at SPS "was a job in the open labor market[.]" Mr. Lala admitted that Claimant went back to work as a bus monitor after the work injury, she continued to work until May 2009, and she then worked again for SPS from September 2009 to December 2009.

Mr. Lala was aware that another rehabilitation expert, James England, had opined that Claimant "was [PTD] before [the work injury.]" Mr. Lala disagreed with Mr. England's opinion for the following reasons:

> [Claimant] interviewed for a position. She obtained it. She completed the job as her employer required and requested her to do. She earned money. She was employed. The nature of her employment changed a little bit, but she was able to work and make -- make more money than she actually wanted to in that job.

Mr. Lala also testified that if Claimant had come to him before the work injury and indicated that she wanted to find a job, he would have tried to find her a job. If Claimant had been PTD at the time of her employment with SPS, Mr. Lala would not have expected Claimant to have continued her employment for two years "rid[ing] on a school bus twice a day for . . . several hours[.]"

*6. Rehabilitation Evidence from Mr. England*

Mr. England's deposition and written report were admitted into evidence on behalf of the Fund. Mr. England evaluated Claimant's records and reviewed her deposition, but he "did not actually meet with [Claimant.]" His understanding was that "approximately 56 other people" worked in the same job as Claimant. He agreed that there were "other jobs out there, where you can sit and stand as needed[.]" Mr. England

10

opined that Claimant's job at SPS was "a job in the open labor market but it certainly, normally, involves more than working 20 hours a week."

Mr. England also opined that Claimant's work injury did not impact her employability in that he did not think "she would be able to do a regular 40 hour work week" given "all of the medical problems that she had up to that point[.]" Mr. England's opinion was that Claimant was PTD "as far back as 1992." He understood "that to be considered employable, competitively employable, we were normally looking at eight hours a day, five days a week."

Mr. England conceded, however, that a worker did not have to work 40 hours per week "to be working and competing in the open labor market." He also testified that he was "not saying that [Claimant] wasn't doing a job that can be considered competitive[,]" but he pointed to Claimant's decision to cut her own hours by not doing "the mid-day run" as significant. In Mr. England's view, "[i]f you are disabled and you are working part-time to supplement your disability benefits [from Social Security] . . . that's not . . . regular competitively employed." He also opined that he was not aware of anything that would prevent Claimant from returning to work at SPS as a bus monitor because he felt her work restrictions after the work injury were the same restrictions that she had before.

*The Findings of the ALJ*

In regard to the governing law, the ALJ did "not find it necessary that a claimant be working a 40 hour week at the time of the last injury to be eligible for workers' compensation benefits." The ALJ also made the following relevant findings: 1) "Claimant was capable of working in the open labor market, and in fact was, at the time of the [work] injury"; 2) Claimant was able to work the morning and afternoon shifts of

11

her bus route without a break during the shifts themselves and Claimant's employment at SPS "was not an accommodated job structured for her by her employer"; 3) Claimant "did not have problems with her ability to squat, crawl, kneel, or climb before January 2009"; 4) "[T]he fact that [Claimant] has been awarded Social Security Disability is not controlling as it is based upon a different standard than the Missouri Workers' Compensation law"; 5) "[C]laimant had injuries that constituted a hindrance or an obstacle to employment" before the work injury, but she was "not [PTD] before [the work injury] as she was able to compete in the open labor market as she obtained and maintained employment as a bus monitor for two and one half years before the work injury";[3] and 6) "[C]laimant is unable to compete in the open labor market as a result of the combination of these prior injuries and [the work injury] that is the subject of this claim" based upon the testimony of Dr. Koprivica and Mr. Lala.

Based on these findings, the ALJ concluded that the "Fund is liable for permanent total disability."

*The Commission's Award*

Upon the Fund's appeal of the ALJ's determination, the Commission affirmed (by a 2-1 vote) the decision of the ALJ, except for "the inaccuracies identified herein[.]"[4] In reaching its decision, the Commission explicitly found Claimant's "testimony to be persuasive." It found that the work injury "caused [Claimant] to suffer new and additional permanent limitations in the form of increased pain and difficulty with

---

[3] Based upon Claimant's testimony that she started work for SPS in March 2007, and the stipulation that the work injury occurred in January 2009, the period of time attributed by the ALJ to Claimant's work for SPS before the work injury was inaccurate.

[4] Instead of adopting the ALJ's finding that Claimant had no problems with squatting, crawling, kneeling or climbing before January 2009, the Commission found that Claimant "felt that she was unable to crawl and squat and that she had problems climbing stairs, and that she would need a cushion for kneeling."

prolonged sitting, and increased difficulty walking." It further found that "it is consistent with the purposes of the [Fund] to award compensation to an employee who, at least up until her last injury, was tenacious enough to compete for and secure a job in the open labor market even though she was suffering from very limiting preexisting conditions."

The Fund then timely filed the instant appeal.

**Analysis**

*Point I – The extent of Claimant's disability prior to the work injury*

The Fund's first point contends there was not "substantial and competent evidence that [Claimant] was only permanently and partially disabled prior to the work injury" because: 1) three out of four experts "found her to be [PTD] prior to the work injury"; 2) Claimant "was only capable of working a part-time split[-]shift job"; 3) "she was unable to work for 15 years prior to her part-time split-shift job"; and 4) before the work injury, Claimant was already "receiving Social Security Disability benefits[.]" We consider these contentions in turn.

First, three out of four experts did not testify that Claimant was PTD prior to the work injury. The Fund wrongly categorizes Dr. Koprivica as one of the "[t]hree experts [who] testified that [Claimant's] limitations, accommodations, and disabilities amounted to [PTD] prior to her work injury[.]" In attempting to fit Dr. Koprivica into this category, the Fund focuses on his testimony that Claimant's disability before the work injury was "profound" and that it was therefore "possible" that had he evaluated her in 2005, he would have found her to be PTD at that time.

Even though Dr. Koprivica regarded Claimant's preexisting disabilities as "profound[,]" he specifically characterized them as less than total when he rated them as

13

"[a] 75 percent permanent partial disability to the body as a whole." Further, Dr. Koprivica's statement that it was "possible" that he would have found Claimant PTD had he evaluated her in 2005 was mere speculation. The Commission was free to give no weight to this part of the doctor's testimony as "[t]he fact finder may reject all or part of an expert's testimony." *Bennett v. Columbia Health Care*, 134 S.W.3d 84, 92 (Mo. App. W.D. 2004). We will not substitute our view of any conflicting evidence for the resolution of the conflict reached by the Commission. *See Dwyer v. Fed. Exp. Corp.*, 353 S.W.3d 392, 395 (Mo. App. S.D. 2011).

Second, the assertion that Claimant "was only capable of working a part-time split shift job" is a *non sequitur*. The test for permanent and total disability permanent is whether Claimant could "compete in the open labor market[,]" *Blackshear*, 420 S.W.3d at 681, and the Fund agrees that Claimant "obtained her job with SPS through normal employment channels[.]" The split-shift schedule Claimant worked was not an accommodation made for her physical conditions; rather, it resulted from the nature of the work itself. As the Fund also acknowledges, Mr. Lala testified that Claimant was not PTD before the work injury occurred. Mr. Lala's opinion was supported by the fact that Claimant had competed for and obtained employment at SPS, thereby demonstrating her employability in the open labor market.[5]

---

[5] The Fund had relied on evidence from Dr. Parmet that Claimant was working only "at a sedentary level with accommodations and on a part-time basis" before the work injury, paired with evidence from its vocational expert, Mr. England, who considered competitive employment to constitute work "normally . . . at eight hours a day, five days a week." Mr. Lala imposed no 40 hours per week condition on his criteria for determining a person's employability in the open labor market. At oral argument, the Fund acknowledged that our recent decision in *Stewart*, which was decided after the reply brief in the instant case was filed, was controlling on Point I. In *Stewart*, the claimant was working part-time at the time of her work injury, and this court upheld the Commission's factual determination that the claimant was PTD after her work-injury and not before. 419 S.W.3d at 916, 919. Our affirmation of that determination should not be interpreted so broadly as to suggest that all part-time employees would necessarily be found to be competing in the open labor market.

14

Concerning the Fund's third sub-point, assuming, *arguendo*, that Claimant was unable to work at a time before she went to work for SPS does not alter the fact that Claimant did compete for and obtain employment with SPS. The Commission simply made a choice between opposing opinions -- each supported by substantial evidence -- about Claimant's employability in the open job market. As a disputed fact question, we are bound by that determination. *Stewart*, 419 S.W.3d at 917.

Fourth, Claimant's receipt of Social Security disability benefits did not prevent the Commission from finding that Claimant was only permanently and partially disabled at the time of the work injury. "Receipt of Social Security disability benefits is not proof by itself that [a claimant] was [PTD] for purposes of Missouri's Workers' Compensation Act." *Farmer-Cummings v. Future Foam, Inc.*, 44 S.W.3d 830, 834 n.1 (Mo. App. W.D. 2001). *Cf. Stewart*, 419 S.W.3d at 917 (the claimant qualified for Social Security disability benefits in 1997 but was also found to have competed for and obtained work in the open labor market before her injury in 2009).

Point I is denied.

*Point II – Significance of Claimant's Return to Work*

The Fund's second point asserts that "[t]he Commission erred in awarding [Claimant] permanent total disability benefits from the Fund," but it does not expressly state the legal reason for its claim and then explain why that legal reason supports its error claim as required under Rule 84.04(d)(2)(B)-(C).[6] Instead, the Fund claims that "if [Claimant's] ability to maintain employment on a part-time split-shift basis with SPS is evidence that she is not [PTD] then [Claimant] was not [PTD] from a combination of [the] work injury . . . and her preexisting disabilities" because she returned to this job "for

---

[6] Rule references are to Missouri Court Rules (2013).

15

almost one . . . year" following the work injury. The Fund does not explain why such evidence prevented the Commission from finding, based on the other evidence before it, that Claimant's disability status had changed from partial to total as a result of the work injury. This court has discretion to dismiss based upon noncompliance with Rule 84.04, *see Bamber v. Dale Hunt Trucking*, 107 S.W.3d 489, 490 (Mo. App. S.D. 2003), but we exercise our discretion here to review the point as a claim that the finding was not supported by substantial, competent evidence.

We agree with Claimant that the fact that she maintained employment after the work injury until December 2009 "does not preclude a finding that she was [PTD] based on [the work injury] and her preexisting disabilities." The relevant test remained whether she could compete in the open labor market. *Blackshear*, 420 S.W.3d at 681. "The key question is whether any employer in the ordinary course of business would reasonably be expected to hire the worker in his or her current physical condition." *Schussler*, 393 S.W.3d at 96. "[N]either the worker's ability to engage in occasional or light duty work nor the worker's good fortune in obtaining work other than through competition on the open labor market should disqualify the worker from receiving such total disability benefits under the Workers' Compensation Law." *Minnick v. S. Metro Fire Prot. Dist.*, 926 S.W.2d 906, 910 (Mo. App. W.D. 1996). Thus, while Claimant returned to work for SPS after her work injury, this did not necessarily mean that she was not PTD or that SPS would have hired her at that time given her then-existing physical condition.[7]

Claimant testified that SPS terminated her employment, and Mr. Lala opined that Claimant was PTD at the time he evaluated her after the work injury. Further, Claimant

---

[7] Among other possibilities, an employer might choose to permit an existing employee to return to work with limitations that a reasonable employer would not accept in a new hire in order to reward past loyalty, to avoid training costs, etc.

16

testified that she first started on light duty when she returned to work in February 2009, she was off during the summer before starting the school year late after undergoing her knee surgery, and she was terminated in December 2009.

The Fund contends that the Commission "mistakenly attributes [Claimant's] trouble walking and pain in her low back, sciatic and pain down both legs causing her legs and feet to get numb, to the work injury[.]" In making this argument, the Fund overlooks Claimant's testimony that she did not work the summer 2009 routes because she "was starting to hurt" and that when she went back to work, she "was hurting a lot more than what [she] had before." Claimant's legs and feet would "go numb with the pain." She was not missing time from work, but she was having problems with the bus seat, and she was "having trouble getting on and off the bus[.]" Even if the Claimant had prior low back problems, and her pre-existing conditions of fibromyalgia and degenerative bone disease were also worsening, the work injury may have aggravated the pre-existing conditions to the point of rendering her PTD if Claimant's other testimony was also believed, and the Commission did find her testimony believable.

The Fund points to the contrary testimony of Dr. Parmet that Claimant had pain in her low back and both legs before the work injury, and that an April 2007 MRI documented disk tears and protrusions. The doctor's testimony was that the work injury temporarily exacerbated this pain, but that by February of 2009, it was "back to her baseline." The Commission was not obligated to credit the testimony cited by the Fund. It could (and did) credit instead Claimant's testimony that her low-back and leg pain was greater than it had been before, and the increased pain negatively affected her ability to get on and off the school bus.

17

Dr. Koprivica agreed that Claimant's report of pain in these areas after the work injury was limited in her medical records, but he also observed that her records were "not very detailed[.]"  And when Dr. Koprivica examined Claimant in August 2009, he found Claimant to be without the full range of motion previously documented by another doctor.  Dr. Koprivica's examination also revealed the presence of sciatica.  Although it had not been described as such in Claimant's medical records, Dr. Koprivica found that the condition was consistent with some pain descriptions that Claimant had provided after the work injury, such as "'[s]harp stabbing down buttocks and reports sharp radiating pain down bilateral posterior thigh regions above the knee.'"

The Commission was entitled to credit Dr. Koprivica's testimony over the testimony of Dr. Parmet, and it did just that when it found -- based upon the testimony of Dr. Koprivica and Mr. Lala -- that "[C]laimant is unable to compete in the open labor market as a result of the combination of these prior injuries and the injury to her neck and back that is the subject of this claim."  Here, as in other cases, "the Commission reasonably could have made its findings and reached its result based upon all of the evidence before it."  *Fitzwater*, 198 S.W.3d at 627.

As we stated in *Stewart*:

> It was within the Commission's "special province" to factually determine if [Claimant] was PTD before, or only after, [the work injury].  *Schussler*, 393 S.W.3d at 96.  Competent, substantial evidence supported a finding either way, and reasonable minds could (and did) differ, so the Commission's decision binds us.  *Pavia*[*v. Smitty's Supermarket*], 118 S.W.3d [228,] 234 [(Mo. App. S.D. 2003)].  Unlike *Grgic*[*v. P & G Constr.*, 904 S.W.2d 464 (Mo. App. E.D. 1995)], this is not the rare exception to the rule of deference to Commission disability determinations.  [The] Fund's proof would support a decision in its favor, "but is not so overwhelming that it compels us to reverse."  *Payne v. Thompson Sales Co.*, 322 S.W.3d 590, 593 (Mo.App.2010).

18

*Stewart*, 419 S.W.3d at 919-20.

Point II is also denied, and the award of the Commission is affirmed.


DON E. BURRELL, J. - OPINION AUTHOR

JEFFREY W. BATES, P.J. - CONCURS

MARY W. SHEFFIELD, J. - CONCURS