

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| TREASURER OF THE STATE OF MISSOURI AS CUSTODIAN OF THE SECOND INJURY FUND, | ) ) ) ) | WD83030 |
| Appellant, | ) ) | OPINION FILED: July 14, 2020 |
| v. | ) ) | |
| JONATHAN PARKER, | ) ) | |
| Respondent. | ) | |

**Appeal from the Labor and Industrial Relations Commission**

Before Division Two: Mark D. Pfeiffer, Presiding Judge, Alok Ahuja, Judge and
Gary D. Witt, Judge

The Treasurer of the State of Missouri as Custodian of the Second Injury Fund ("Fund") appeals the final award of the Labor and Industrial Relations Commission ("Commission") finding that Jonathan Parker ("Parker") is permanently and totally disabled in part due to preexisting disabilities, triggering Fund liability. We affirm.

## Factual and Procedural Background[1]

Parker is a 46-year-old man with a ninth grade education who has performed manual labor throughout his career. He has unsuccessfully attempted to earn his GED multiple times. Parker has had no other formal education and possesses minimal computer skills.

Parker began working for his family's tree service at the age of sixteen splitting firewood and trimming trees. He left the family business to work in a box factory feeding corrugated paper into a machine. This job required constant standing, bending, twisting, and continuous use of his arms. Parker later worked at another box factory making printed dyes. At this factory, Parker had to lift a five-gallon bucket full of ink, climb onto a machine, pour the ink into a trough, and later climb onto the machine to retrieve the dyes. Parker returned to tree service work with his family for a period of time, before going to work at Asplundh in 2004. At Asplundh, he performed duties exclusively for Independence Power and Light Company. He was responsible for trimming and removing tree branches near power lines.

While with Asplundh, Parker worked as a groundsman, a tree trimmer, and a foreman. As a groundsman, Parker set up cones and signs, got tools for coworkers, removed branches and fed them through the wood chipper, and raked lawns after the work was complete. Parker later worked as a tree trimmer climbing trees and using equipment like ladders, chainsaws, and tree spikes. As a tree trimmer, he wore a tree saddle, which

---

[1] "In reviewing the Commission's decision, we view the evidence objectively and not in the light most favorable to the decision of the Commission." *Moss v. Treasurer of State of Mo.-Custodian of Second Injury Fund*, 570 S.W.3d 110, 113 n.2 (Mo. App. W.D. 2018) (quoting *Poarch v. Treasurer of State of Mo.-Custodian of Second Injury Fund*, 365 S.W.3d 638, 642 (Mo. App. W.D. 2012)).

held all of his tools and equipment. Trim work required a trim saw that weighed approximately five pounds, but groundwork required use of a bigger and heavier saw.

On June 18, 2014, Parker filed a claim against his employer and the Fund for repetitive injury to his neck and body as a whole ("Primary Injury") with a date of injury listed as before and after June 12, 2014. The injury related to his work including but not limited to heavy lifting and looking up on a repetitive basis to trim trees that resulted in injury. Parker had sustained multiple injuries prior to the injuries giving rise to this claim. In May of 2012, Parker injured his back. He was seen in the emergency room and prescribed a muscle relaxer. An MRI showed degenerative changes at the L5-S1 level of his low back. In the years following, Parker was prescribed pain medication on a few occasions and had one epidural injection. In November of 2012, Parker was also diagnosed with a knee sprain.

On March 8, 2014, Parker suffered a work injury to the right elbow at Asplundh. Parker went to remove his chainsaw from a ring on his left hip and as he extended his arm out away from his body he felt a "pop" in his arm. Parker reported his injury to Asplundh and received treatment. An MRI showed a partial tendon tear, and Parker was prescribed medications and physical therapy and was placed on light duty with a ten-pound weight restriction.

In May of 2014, Parker underwent electrodiagnostic studies of the right upper extremity, but all findings of the right upper extremity and neck were normal. An MRI revealed moderate spinal stenosis at C3-4 and mild stenosis at C4-5 and C7-T1. Parker

3

had an orthopedic consult on May 22, 2014. Parker was also diagnosed with a right elbow distal bicep tear, right elbow lateral epicondylitis with partial thickness common extensor tear, and right shoulder complaints, as well as right upper extremity paresthesia complaints. Parker was released to full duty on January 13, 2015. Thirty days later, Parker received a diagnosis of tendonitis and bursitis. Parker was released to return to work without permanent restrictions on March 26, 2015.

Following the March 26, 2015 release, Parker never returned to work on a full duty status. He never returned to climbing trees or performing tree-trimming work but continued in light duty positions until taken off work following a cervical fusion on September 3, 2015 (a surgery necessitated by his June 12, 2014 work injury). Parker always worked full time before June 12, 2014, with some occasional help from coworkers if he was not able to climb. After filing his June 2014 claim for his Primary Injury, Dr. Steven Wilkinson ("Dr. Wilkinson"), an orthopedic surgeon, initially evaluated Parker and believed there was a disc herniation in Parker's neck causing numbness and tingling in the hands and pain that radiated down into the arm.

In October of 2014, Parker underwent evaluation for ongoing neck complaints with Dr. Harold Hess ("Dr. Hess"), an orthopedic specialist. Dr. Hess related the neck pain, numbness that extended down into both legs when he laid down, weakness in both legs, worsening trouble with balance, and electrical shocks down his left arm to the repetitive work injury. At the time of Dr. Hess's evaluation, Parker had previously received physical therapy related to neck complaints from October 16, 2013, through November 15, 2013.

4

During that time, he continued to work as a foreman constantly looking upwards, which Dr. Hess opined exacerbated Parker's complaints. Parker had also undergone right elbow surgery on August 13, 2014, but continued to have neck pain. Dr. Wilkinson recommended epidural injections, but Dr. Hess believed Parker had a cervical spinal cord contusion and that Parker needed an anterior cervical discectomy and fusion at C3-C4.

A third surgeon, Dr. Adrian Jackson ("Dr. Jackson") saw Parker for ongoing neck complaints. Dr. Jackson assessed Parker with a C3-C4 spinal cord compression with evidence of intrinsic spinal cord changes and mild edema. Dr. Jackson recommended Parker undergo physical therapy and reconditioning exercises following surgery. Dr. Jackson placed work restrictions on Parker of no repetitive bending or lifting with no overhead work and no lifting over fifteen pounds. On November 25, 2015, Dr. Jackson released Parker return to regular duty without restrictions.

Parker has had ongoing problems since the neck surgery including choking when he tries to take pills, difficulty with eating and swallowing, difficulty looking up, and grinding and popping in his neck when he turns his head. Parker has constant pain in his neck, even when it is not moving. Parker offered to return to work at Asplundh as a trainer, training people on tree trimming, but notified them he could no longer climb trees. He never received a response from Asplundh nor did he receive a termination letter.

Next, Parker attempted to work at Dollar Tree retail establishment. He told his manager about his physical problems during his interview and was hired and allowed to attempt to perform the job in the summer of 2016. His duties at Dollar Tree included

stocking shelves, which required him to walk, bend, and move up and down throughout the day. Parker was employed by Dollar Tree a few weeks in June and July of 2016 before quitting due to pain from his injuries. He has not worked since that time.

Parker changes body positions throughout the day and has shooting pain down his left leg that cause him to fall unexpectedly. He has fallen several times because of the shooting pains in his leg, once causing him to break his wrist and his first finger knuckle. He is currently prescribed Gabapentin for pain. Parker testified that his back pain is currently intense and constant. He has used his riding lawn mower but he is not able to finish mowing his whole lawn without stopping due to increased back pain symptoms.

Dr. James Stuckmeyer ("Dr. Stuckmeyer") performed a medical evaluation on February 15, 2016, at the request of Parker. Treatment for the March 8, 2014, and June 12, 2014, work injuries overlapped, but Dr. Stuckmeyer separately addressed the disability related to each injury. Dr. Stuckmeyer opined that Parker sustained a significant injury to his right upper extremity on March 8, 2014, requiring the operative reconstruction of the right elbow performed by Dr. Daniel Stechschulte ("Dr. Stechschulte"). Dr. Stuckmeyer opined within a reasonable degree of medical certainty that Parker has ongoing problems and issues with his right elbow post right elbow reconstruction and further found that as a direct, proximate and prevailing factor of the March 8, 2014, accident Parker suffered a 30% permanent partial disability to the right upper extremity at the shoulder.[2]

_____

[2] Dr. Stuckmeyer rated Parker at the shoulder rather than the elbow because he had signs of impingement all the way up to the shoulder as a result of this injury.

Dr. Stuckmeyer stated that as a direct, proximate and prevailing factor of the intense repetitive nature of the occupational duties at Asplundh, Parker sustained a work injury on June 12, 2014. Dr. Stuckmeyer indicated that Parker developed symptoms consistent with chronic neck pain and early myelopathy, which necessitated the anterior cervical discectomy and fusion. Dr. Stuckmeyer noted that Parker continued to have ongoing symptoms of significant neck pain primarily with extension, which was required for his work as a tree trimmer. Dr. Stuckmeyer opined that within a reasonable degree of medical certainty the direct, proximate, and prevailing factor of the injury to Parker's neck was repetitive overuse culminating on June 12, 2014. Dr. Stuckmeyer opined that Parker sustained a 35% permanent partial disability of the neck. Dr. Stuckmeyer provided restrictions of no repetitive flexion/extension, no repetitive side bending and lateral rotation of the cervical spine, and no torsional activities involving the cervical spine. Additionally, he recommended no lifting to exceed twenty to twenty-five pounds on an occasional basis with the right upper extremity below shoulder height and fifteen to twenty pounds above shoulder.

Dr. Stuckmeyer issued a second report on July 3, 2016, after he reviewed Michael Dreiling's ("Dreiling") vocational assessment. Dr. Stuckmeyer noted that based on the vocational assessment, Parker would have been able to return to gainful employment in some capacity when looking solely at the March 8, 2014 repetitive use injury to the right upper extremity. Dr. Stuckmeyer went on to opine that the repetitive use injury to the

7

cervical spine of June 12, 2014, resulted in Parker being permanently and totally disabled when it was considered alone and in isolation.

On January 12, 2018, Dr. Stuckmeyer authored his third and final report. Dr. Stuckmeyer acknowledged that he had previously opined that the June 12, 2014 work injury resulted in permanent and total disability in isolation. However, following review of additional medical records and deposition transcripts, he changed his opinion to permanent total disability based on a combination of Parker's preexisting lumbar spine and knee conditions, his March 8, 2014 upper extremity injury, and the June 12, 2014 neck injury.

Dr. Stuckmeyer's final report references five new medical notes that resulted in his changed opinion. They were: (1) a May 27, 2010, consult for back pain and MRI; (2) a June 22, 2011, record for a visit with complaints of back pain; (3) a November 14, 2012, complaint of right knee sprain; (4) a January 28, 2013, note of back pain radiating into the leg; and (5) an evaluation for rapid heartbeat and palpation.

Dreiling, Parker's vocational expert, authored a vocational report on May 3, 2016. Dreiling stated that Parker had not participated in any formal vocational rehabilitation services but was looking for work in the open labor market. Dreiling opined that Parker should have been able to return to work in the open labor market because Parker had been released to return to work at full-duty after both his right elbow surgery and his neck surgery. However, when Dreiling considered the restrictions Dr. Stuckmeyer placed on him, he did not believe that Parker was capable of returning to any of his past employments.

8

Dreiling went on to conclude that based on the entirety of Parker's vocational profile including Dr. Stuckmeyer's medical restrictions and Parker's difficulty with sitting or standing for any length of time, Parker would have trouble competing for and obtaining employment in the open labor market. In his report, Dreiling opined that no employer in the usual course of business seeking persons to perform duties of employment in the usual and customary way would reasonably be expected to employ Parker in his present condition.

Dreiling testified in a deposition taken on November 29, 2016, that Parker still had a valid CDL through February 2017. Dreiling testified that Parker worked with light duty restrictions following the right elbow surgery, but Parker was not able to work with any light duty restrictions following the neck surgery. Dreiling testified that he reviewed the report of another vocational expert, Terry Cordray, and learned that Parker worked at Dollar Tree for a few weeks in July 2016, following his medical release from neck surgery. Dreiling testified that Parker's inability to work in the open labor market hinged on Parker's subjective complaints of the back, hips, and legs. Dreiling agreed that Parker was not restricted from sitting or standing by any physician. Dreiling testified that Parker's difficulties with sitting for more than an hour, standing for more than thirty minutes, poor sleep at night because of pain, and pain issues including the back, left leg, and left hip which are unrelated to the work injuries involving the shoulder injury and cervical spine.

Parker settled his March 8, 2014, work injury with Asplundh for 25% permanent partial disability of the right shoulder at the 232-week level. Parker settled his Primary

9

Injury with Asplundh for 40% permanent partial disability of the cervical spine at the 400-week level. Parker dismissed his claim against the Fund for the March 8, 2014 work injury, and proceeded to hearing against the Fund related to his June 12, 2014, Primary Injury.

At the hearing, Parker offered Exhibit A "Notice of Filing of Medical Report Pursuant to Section 287.210 for the Report of Dr. James Stuckmeyer dated February 15, 2015, and July 3, 2016" ("Exhibit A"). Parker also offered Exhibit B "Notice of Filing of Medical Report Pursuant to Section 287.210 for the report of James Stuckmeyer dated January 12, 2018." ("Exhibit B"). The Fund did not object to the admission of the reports of Dr. Stuckmeyer at the hearing, but objected to the medical records attached to the reports, arguing that they did not include the proper medical records affidavits. The Fund stated in its objection that section 287.210.7 applies only to the admission of medical reports and does not make the accompanying medical records admissible for evidentiary purposes. The ALJ overruled the Fund's objection and admitted Exhibits A and B into evidence.

The ALJ found the Fund liable for permanent total disability benefits based on section 287.220.2. The Commission affirmed and adopted the award of the ALJ as supplemented and corrected in their Final Award Allowing Compensation. This appeal followed.

10

## Standard of Review

Section 287.490.1[3] controls our review of the Commission's Final Award:

The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

"This court will uphold the Commission's award if it is supported by competent and substantial evidence and is not contrary to the overwhelming weight of the evidence." *Patterson v. Cent. Freight Lines*, 452 S.W.3d 759, 764 (Mo. App. E.D. 2015). "In reviewing a workers' compensation award, we examine the record as a whole to determine if the award is supported by sufficient competent and substantial evidence, or whether the award is contrary to the overwhelming weight of the evidence." *Lawrence v. Treasurer of State-Custodian of Second Injury Fund*, 470 S.W.3d 6, 12 (Mo. App. W.D. 2015). We are to review an award objectively; rather than viewing the evidence and its inferences in the light most favorable to the award. *Id.* "[W]e review issues of law, including the Commission's interpretation and application of the law, *de novo*." *Id.*

---

[3] All statutory references are to the Revised Statutes of Missouri (2016) as currently updated unless otherwise specified.

11

**Analysis**

The Fund raises three points on appeal. In its first point, the Fund argues that the Commission improperly applied section 287.220.2 ("Subsection 2") rather than section 287.220.3 ("Subsection 3"). In its second point, the Fund asserts the Commission erred in awarding Parker permanent total disability benefits because Parker failed to prove he had a subsequent compensable work-related injury in that no medical or vocational expert opined that the permanent total disability resulted solely from injuries that meet the criteria of section 287.220.3. In its third point, the Fund alleges the Commission erred in allowing into evidence Parker's medical records attached to the expert's medical reports because section 287.210.7 allows only complete medical reports into evidence. We address each in turn.

**Points One and Two[4]**

In its first point on appeal, the Fund asserts that the Commission erred in finding Fund liability because it improperly applied Subsection 2 in that *Cosby v. Treasurer*, 579 S.W.3d 202 (Mo. banc 2019) held that Subsection 3 applies when the primary work related injury occurs after January 1, 2014, and the parties agree that Parker's Primary Injury date for purposes of this analysis was June 12, 2014.[5] Parker concedes that the Commission

---

[4] Because the parties agree that Point One has merit but dispute the effect of the application of section 287.220.3 on the Final Award under Point Two, we address Points One and Two together.

[5] We note that the Commission's Award in this matter was handed down on June 26, 2019, only one day after the Supreme Court handed down its decision in *Cosby*. The Commission's Award applied the analysis of *Gattenby v. Treasurer of Missouri-Custodian of the Second Injury Fund*, 516 S.W.3d 859 (Mo. App. W.D. 2017), which was overturned by *Cosby*.

12

applied Subsection 2 even though *Cosby* requires the application of Subsection 3. We agree.

However, in its second point, the Fund argues that even if the Commission applied Subsection 3, Parker failed to meet his burden to prove he has a subsequent compensable work-related injury that when combined with a preexisting injury which meets the criteria of section 287.220.3(2)(a)a(i)-(iv). Parker argues in response that under the proper standard, he met his burden to establish that he is permanently and totally disabled due to the combination of his March 8, 2014 injury to his right upper extremity and his subsequent Primary Injury to his neck, giving rise to Fund liability.

Section 287.220.3(2) provides, in relevant part:

> (a) a. An employee has a medically documented preexisting disability equaling a minimum of fifty weeks of permanent partial disability compensation according to the medical standards that are used in determining such compensation which is:

> (i) A direct result of active military duty in any branch of the United States Armed Forces; or

> (ii) A direct result of a compensable injury as defined in section 287.020;[6] or

> (iii) Not a compensable injury, but such preexisting disability directly and significantly aggravates or accelerates the subsequent work-related injury and shall not include unrelated preexisting injuries or conditions that do not aggravate or accelerate the subsequent work-related injury; or

> (iv) A preexisting permanent partial disability of an extremity, loss of eyesight in one eye, or loss of hearing in one ear, when there is a subsequent compensable work-related injury as set forth in subparagraph b of the

---

[6] "An injury by accident is compensable only if the accident was the prevailing factor in causing both the resulting medical condition and disability." Section 287.020.3(1).

13

opposite extremity, loss of eyesight in the other eye, or loss of hearing in the other ear; and

      b. Such employee thereafter sustains a subsequent compensable work-related injury that, when combined with the preexisting disability, as set forth in items (i), (ii), (iii), or (iv) of subparagraph a. of this paragraph, results in a permanent total disability[7] as defined under this chapter[.]

The Fund relies on *Dubuc v. Treasurer of State-Custodian of Second Injury Fund*, 597 S.W.3d 372, 384 (Mo. App. W.D. 2020), where the Commission improperly applied Subsection 2 and we remanded to the Commission with instruction to apply Subsection 3 to argue that this matter must be remanded to the Commission for further findings. However, the instant case is distinguishable from *Dubuc* for two reasons. First, the parties in *Dubuc* disputed whether Subsection 2 or Subsection 3 was applicable. *Id*. at 377-80. In this case, the Fund and Parker both agree that Subsection 3 governs the Fund's liability. Second, the record before us in *Dubuc* was insufficient to determine whether Dubuc's Primary Injury and Dubuc's Preexisting Injuries triggered fund liability, and therefore, remand was appropriate in that the Commission needed to make additional findings of fact before we could properly review the issues. *Id*. at 383-84. However unlike in *Dubuc*, the record in the instant case is sufficient for us to address the two issues we must decide. First, we must determine whether there is sufficient competent evidence in the record to warrant the making of the award, and second, we must determine whether the facts found by the Commission support the award. We address each in turn.

---

[7] "The term 'total disability' as used in this chapter shall mean inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident." Section 287.020.6.

14

To recover against the Fund based on his claim, Parker had to establish pursuant to 287.220.3(2) that he had: (1) a medically documented preexisting disability equaling a minimum of fifty weeks of permanent partial disability compensation, which was a direct result of a compensable injury under the Workers Compensation Law (section 287.220.3(2)(a)a(ii)); and (2) he thereafter sustained a subsequent compensable work-related injury that, when combined with the preexisting disability, resulted in a permanent total disability (section 287.220.3(2)(a)b).

**Preexisting Disability**

Dr. Stuckmeyer found "within a reasonable degree of medical certainty that a direct, proximate cause, and prevailing factor of the accident occurring on March 8, 2014, that [Parker] sustained a significant injury to his right upper extremity requiring the operative reconstruction of the right elbow performed by Dr. Stechschulte." He further opined that "Parker not only has ongoing problems and issues with his right elbow status post right elbow reconstruction, but has evidence of an impingement syndrome of the right shoulder with evidence of posterior myofascial syndrome and limitation in range of motion." Dr. Stuckmeyer concluded that, "Parker's permanent and total disability from the labor market would now be due to a combination of disabilities stemming from the most recent workplace injury on June 12, 2014, in combination with significant preexisting disability stemming from the workplace injury occurring on March 8, 2014, and considering the significant preexisting disabilities involving his lumbar spine and bilateral knees." [8]

---

[8] Parker and Asplundh settled the claim related to Parker's right upper extremity for 25% permanent partial disability of the right shoulder at the 232-week level. Resulting in benefits for 58 weeks of compensation. Parker

15

The Commission found that "[Parker] sustained a pre-existing injury from his work related accident on March 8, 2014, for which he received 25% permanent partial disability at the 232 week level of the right upper extremity," which satisfies the first threshold as a compensable injury resulting in fifty week or more of permanent partial disability compensation.[9] The evidence was sufficient to support the Commission's finding that Parker's work related injury to his shoulder from March 8, 2014, met the statutory threshold of 287.220.3(2)(a)a(ii) that he had: a medically documented preexisting disability equaling a minimum of fifty weeks of permanent partial disability compensation, which was a direct result of a compensable injury under the Workers Compensation Law.

**Primary Injury**

Dr. Stuckmeyer stated that as a direct, proximate and prevailing factor of the intense repetitive nature of the occupational duties at Asplundh, Parker sustained a work related injury on June 12, 2014 to his neck. Dr. Stuckmeyer indicated that Parker developed symptoms consistent with chronic neck pain and early myelopathy, which necessitated the anterior cervical discectomy and fusion. Dr. Stuckmeyer noted that Parker continued to have ongoing symptoms of significant neck pain primarily with extension, which was required for his work as a tree trimmer. Dr. Stuckmeyer opined that within a reasonable

---

and Asplundh settled his underlying Primary Injury claim for 40% permanent partial disability to the body as a whole, which is the 400 week level. Resulting in benefits for 160 weeks of compensation.

[9] The Fund argues that Dr. Stuckmeyer's testimony is not credible because Dr. Stuckmeyer first opined in 2016 that Parker was permanently and totally disabled as a result of the June 12, 2014 injury in isolation. However, the Commission found Dr. Stuckmeyer's final testimony to be credible regarding Parker's permanent total disability, and we defer to the credibility determinations of the Commission. *Treasurer of State-Custodian of Second Injury Fund v. Cook*, 323 S.W.3d 105, 110 (Mo. App. W.D. 2010).

degree of medical certainty the direct, proximate, and prevailing factor of the injury to Parker's cervical spine was work related repetitive overuse culminating on June 12, 2014. Parker and Asplundh settled his Primary Injury claim for 40% permanent partial disability to the body as a whole, which is the 400 week level. Resulting in benefits for 160 weeks of compensation. This evidence was sufficient to support the Commissions finding that Parker thereafter sustained a subsequent compensable work-related injury. This evidence established that Parker met the statutory threshold of subsection b. -- that he sustained a subsequent work-related injury.

**Total Disability**

Dr. Stuckmeyer gave his opinion that Parker was permanent total disability based on a combination of Parker's preexisting lumbar spine and knee conditions, his March 8, 2014, upper extremity injury, and the June 12, 2014, neck injury. Dreiling testified that Parker was unemployable because of Parker's restrictions related to his shoulder injury when combined with his restrictions related to his cervical spine injury when considering Parker's work history, lack of education, and lack of clerical skills. The record does not reflect that Parker had any restrictions related to his previous bilateral knee and lumbar spine injuries. "I think [Parker] would have considerable difficulty with just the neck problem and the shoulder problem with the other factors regarding his work history, his lack education [sic], his no clerical skills, I think it is just going to be real difficult for him to perform work."

The Commission found that:

[] Dreiling felt that [Parker] was unemployable due to his entire vocational profile, which included both his lack of GED and his restrictions from both his neck and his shoulder, as well as the comments that [Parker] made about his back pain and the difficulty that gave him sitting and standing. [We] believe it was the opinion of both [Dr. Stuckmeyer and Dreiling] that [Parker] is permanently and totally disabled as a result of a combination of all his disabilities.

Through the testimony of both Dr. Stuckmeyer and Dreiling, we find there is sufficient evidence to support the Commission's finding that Parker is now permanently and totally disabled.

**Disabilities That May Be Considered in Determining Total Disability**

The Fund argues that the Commission erred in considering Parker's pre-existing lumbar spine and knee injuries because the statute does not permit the consideration of injuries or disabilities that do not result in permanent partial disability compensation of fifty weeks or more in determining whether an employee is permanently and totally disabled. This is a matter of first impression as no other Missouri Court has addressed whether the Commission may consider less serious injuries, disabilities or conditions that do not meet the fifty weeks or more of permanent partial disability compensation threshold in finding Fund liability for permanent total disability under Section 287.220.3(2).

We must not lose sight of the reason why the Fund was created.

The purpose of the Second Injury Fund is twofold: to encourage the employment of individuals who are already disabled; and to relieve an employer or his insurer of liability for the previously disabled employee's total and permanent disability where that disability is not specifically attributable to an injury suffered during the period of employment with that employer.

18

*Roby v. Tarlton Corp.*, 728 S.W.2d 586, 589 (Mo. App. E.D. 1987) (overruled on other grounds by *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo banc. 2003)).[10]

In 2013 when the General Assembly amended section 287.220, the Fund was insolvent and the General Assembly sought to limit some of the claims that would previously have been eligible for benefits from the Fund. *Cosby,* 579 S.W.3d at 109-10. The General Assembly specifically eliminated all liability of the Fund for any claim of permanent partial disability that occurred after January 1, 2014, and limited the Fund to coverage for claims of permanent total disability. *Id.* at 207.

In determining whether an employee is permanently and totally disabled, vocational experts must consider the unique circumstances of each individual and routinely rely on various factors such as prior education, previous work experience, age, and potential for retraining. *See Williams v. Treasurer of Mo.*, 598 S.W.3d 180, 187 (Mo. App. E.D. 2020) (vocational expert considered employee's vocational skills and work history); *Glasco v. Treasurer of State-Custodian Second Injury Fund*, 534 S.W.3d 391, 396 (Mo. App. W.D. 2017) (vocational expert considered age and education); *Sage v. Talbot, Indus.*, 427 S.W.3d 906, 910 (Mo. App. S.D. 2014) (medical expert opined that employee's need for narcotics to manage pain would limit employee's concentration and retraining capacities); *Treasurer of State-Custodian Second Injury Fund v. Cook*, 323 S.W.3d 105, 111 (Mo. App. W.D. 2010) (vocational expert opined that employee was not a good candidate for "retraining due to his age, physical restrictions, lack of a high school diploma, and limited educational

---

[10] Although the statutes governing the Second Injury Fund have been amended since *Roby*, the underlying purpose of the Fund is the same.

19

skills). The Fund does not object to the Commission considering the evidence of Parker's work history, limited education, and lack of clerical skills in reaching the determination of Parker's total disability. Vocational experts have also historically considered previous physical limitations and medical diagnoses which may or may not be related to a work related injury in making the determination of whether an employee is permanently and totally disabled. *See Hazeltine v. Second Injury*, 591 S.W.3d 45, 64 (experts considered that employee had depression and anxiety, which were treated with medication); *Dierks v. Kraft Foods*, 471 S.W.3d 726, 741 (Mo. App. W.D. 2015) (employee was permanently and totally disabled when vocational expert considered employee's rheumatoid arthritis, degenerative arthritis, sleep apnea, and obesity); *Schussler v. Treasurer of State-Custodian of Second Injury Fund*, 393 S.W.3d 90, 92-93 (Mo. App. W.D. 2012) (vocational expert considered that employee had depression, post-traumatic stress disorder, diabetes, and Hepatitis C). As these cases show, the Commission and the courts have routinely considered these factors in determining if an employee is permanently and totally disabled in workers compensation proceedings, including claims against the Fund.

The General Assembly has at various times changed or tightened the thresholds that must be met before a claim may qualify for Fund compensation to provide more precise standards and exclude *de minimus* injuries from triggering liability. *Treasurer of State-Custodian of Second Injury Fund v. Witte,* 414 S.W.3d 455, 467 (Mo. banc 2013). Prior injuries that may not have provided any significant hindrance to the employee finding future employment were excluded and more serious disabilities were statutorily required

20

as a threshold to trigger Fund liability. *Id*. When the General Assembly reduces the Fund's liability, employers have more liability for an employee's injuries. *See Fed. Mut. Ins. Co. v. Carpenter*, 371 S.W.2d 955, 957 (Mo. 1963) ("[I]n the absence of an apportionment statute or second injury fund legislation, the employer is liable for the entire disability resulting from a compensable injury[.]"). The 2014 amendments to section 287.220 implement additional threshold restrictions to Fund liability and are consistent with this historical framework.

The Fund argues that the language of subsection b.—"Such employee thereafter sustains a subsequent compensable work-related injury that, when combined with the preexisting disability, as set forth in items (i), (ii), (iii), or (iv) of subparagraph a. of this paragraph, results in a permanent total disability as defined under this chapter"— must be read in a vacuum and that the only thing the Commission and a court may consider is the preexisting work related disability from subparagraph a. combined with the Primary Injury in determining if the employee is permanently and totally disabled. The Fund argues that, under the language of the statute, everything that is considered in determining if an employee is permanently and totally disabled must fall within items (i), (ii), (iii), or (iv) of subparagraph a. of the statute or the Fund cannot be liable for the claim. The Fund argues that because Dr. Stuckmeyer considered Parker's previous bilateral knee and lumbar spine injuries in reaching his opinion that Parker was permanently and totally disabled, that these additional injuries or disabilities remove him from Fund liability under the statute because there was no proof that these injuries fell within items (i), (ii), (iii), or (iv) of subparagraph

21

a. of the statute. Even though the record does not demonstrate that Parker had any work restrictions related to his previous bilateral knee and lumbar spine injuries and even though Parker is now permanently and totally disabled, the Fund argues these prior injuries make him ineligible for Fund liability.

We note that in subsection of section 287.220.3(2)(a)a(iii), the General Assembly included restrictive language which provides that a qualifying injury may include an injury that is "[n]ot a compensable injury, but such preexisting disability directly and significantly aggravates or accelerates the subsequent work-related injury and *shall not include unrelated preexisting injuries or conditions that do not aggravate or accelerate subsequent work-related injury*[.]" (emphasis added). Similar restrictive language is absent from the relevant subsection at issue before us. Because the General Assembly included this restrictive language in one subsection and not another within the same section, we presume it did so intentionally. *Phoenix v. Summer Inst. of Linguistics*, 568 S.W.3d 39, 45 (Mo. App. E.D. 2019) ("The General Assembly certainly knew how to impose such [geographic] limitation[s], as evident in other provisions where it qualified employment with the phrase 'within this state' or 'in this state.'"); *see City of Aurora v. Spectra Commc'ns Grp., LLC.*, 592 S.W.3d 764, 783 (Mo. banc 2019) ("In determining legislative intent, the statute is read as a whole and *in pari materia* with related sections. This Court presumes each word, clause, sentence, and section of a statute will be given the meaning and that the legislature did not insert superfluous language.") (internal quotations and citations omitted); *State ex rel. Goldsworthy v. Kanatzar*, 543 S.W.3d 582, 586 (Mo. banc 2018) ("The legislature will

22

not be presumed to have inserted idle verbiage or superfluous language in a statute.")
(internal quotations omitted); *Hewitt v. St. Louis Rams P'ship*, 409 S.W.3d 572, 574 (Mo.
App. E.D. 2013) ("We must presume that the legislature included every word of a statute
for a purpose, and that every word has meaning.").

The Fund argues that the statutory mandate that chapter 287 be strictly construed
requires we adopt their proposed reading of the statute. However, "[t]his Court will not
add words to a statute under the auspice of statutory construction" strict or otherwise. *Li
Lin v. Ellis*, 594 S.W.3d 238, 242 (Mo. banc 2020) (quoting *Macon Cty. Emergency Servs.
Bd v. Macon Cty. Comm'n*, 485 S.W.3d 353, 355 (Mo. banc 2016)). In order to adopt the
Fund's reading of the statute we would be required to graft language into the statute that is
not present so that it would read:

> b. Such employee thereafter sustains a subsequent compensable work-related
> injury that, when combined **only** with the preexisting disability, as set forth
> in items (i), (ii), (iii), or (iv) of subparagraph a. of this paragraph, **and no
> other preexisting disability or other condition,** results in a permanent total
> disability as defined under this chapter[.] (words in bold added by author).

As the language of 287.220.3(2)(a)a(iii) shows the General Assembly was aware of
how to make limitations such as the Fund argues should be applicable, but chose not to
include these further limitations in this particular subsection.

Further, if we were to adopt the Fund's argument, that under the language of the
statute everything that is considered in determining if an employee is permanently and
totally disabled must fall within items (i), (ii), (iii), or (iv) of subparagraph a. or the Fund
cannot be found liable for a claim, the Commission and the courts would be prohibited not

23

only from considering other injuries, disabilities or physical limitations, but also from considering things such as the employee's age, weight, employment history, educational history, potential for retraining, physical limitations, etc. in determining Fund liability. This would effectively eliminate all liability of the Fund for all claims, as every individual is unique and almost every individual will have some personal characteristics other than qualifying work related injuries that will affect their ability to be employed on the open labor market.

Just as the Commission may consider the employee's age, weight, employment history, educational history, potential for retraining, physical limitations, and the myriad of other characteristics that each unique individual may have that affect their ability to be employed on the open labor market, so long as the employee meets the thresholds set forth in the statute, the Commission may consider other disabilities or injuries in determining if an employee is permanently and totally disabled subjecting the Fund to liability.

Therefore, we hold that so long as an employee has a preexisting disability that satisfies one of the thresholds in Subsection 3 and the employee has a qualifying subsequent primary injury, then the Commission may consider less serious preexisting injuries and disabilities as well as all other characteristics of the individual in determining whether an employee is permanently and totally disabled as a result. Thus, even applying Subsection 3, we find that the facts as found by the Commission are sufficient to warrant the making of the award.

**Point Three**

In its third point on appeal, the Fund alleges the Commission erred in admitting Dr. Hess's medical report into evidence, which was attached to Dr. Stuckmeyer's medical report, in that section 287.210.7 allows only Dr. Hess's complete medical report into evidence. Section 287.210.7 provides in relevant part:

> The testimony of a treating or examining physician may be submitted in evidence on the issues in controversy by a complete medical report and shall be admissible without other foundational evidence subject to compliance with the following procedures. The party intending to submit a complete medical report in evidence shall give notice at least sixty days prior to the hearing to all parties and shall provide reasonable opportunity to all parties to obtain cross-examination testimony of the physician by deposition. The notice shall include a copy of the report and all the clinical and treatment records of the physician including copies of all records and reports received by the physician from other health care providers. . . . Within ten days after receipt of such notice a party shall dispute whether a report meets the requirements of a complete medical report by providing written objections to the offering party stating the grounds for the dispute, and at the request of any party, the administrative law judge shall rule upon such objections upon pretrial hearing whether the report meets the requirements of a complete medical report and upon the admissibility of the report or portions thereof. If no objections are filed the report is admissible, and any objections thereto are deemed waived.

(emphasis added). A complete medical report is

> the report of a physician giving the physician's qualifications and the *patient's history*, complaints, details of the findings of any and all laboratory, X-ray and *all other technical examinations, diagnosis*, prognosis, nature of disability, if any, and an estimate of the percentage of permanent partial disability, if any. An element or elements of a complete medical report may be met by the physician's records.

Section 287.210.5 (emphasis added). A complete medical report requires the reporting physician to provide the patient's history as well as other examinations and diagnoses, we

25

conclude that underlying medical records which formed a basis for the physician's opinions or diagnosis and are normally considered by medical professionals in the field are properly included in the "complete medical report" as contemplated by section 287.210. Because in preparing his report, Dr. Stuckmeyer reviewed and relied on Dr. Hess's report, Dr. Hess's report constituted a portion of Dr. Stuckmeyer's complete medical report. Therefore, pursuant to section 287.210.7, Dr. Hess's report was admissible through Dr. Stuckmeyer's medical report.

Point Three is denied.

## Conclusion

We affirm the final award of the Commission in favor of Parker.

_____
Gary D. Witt, Judge

Pfeiffer, Presiding Judge, joins in the majority opinion
Ahuja, Judge, dissents in separate opinion

26



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

TREASURER OF THE STATE OF ) 
MISSOURI AS CUSTODIAN OF ) 
THE SECOND INJURY FUND, ) 
              Appellant, ) 
               ) 
v. )   **WD83030**
               ) 
**JONATHAN PARKER,** )   **FILED: July 14, 2020**
           Respondent. ) 

## DISSENTING OPINION

This case raises the question whether a worker's compensation claimant with a post-2014 injury is permanently and totally disabled as a result of a combination of the current ("primary") injury and pre-existing disabilities, and is therefore entitled to compensation from the Second Injury Fund. The majority concludes that, in determining whether the claimant is permanently and totally disabled, it is appropriate to consider _all_ of the claimant's pre-existing disabilities, even when some of those pre-existing disabilities do not meet the statutory criteria found in § 287.220.3(2)(a)a ("Subsection _a_"). Because this conclusion is inconsistent with the statutory provisions governing the Fund's liability for post-2014 injuries, I respectfully dissent.

Section 287.220 was amended in 2013 to sharply limit the circumstances in which the Second Injury Fund is liable to compensate workers with pre-existing disabilities who thereafter suffer workplace injuries. As the Missouri Supreme Court has recognized, "at the time section 287.220 was amended [in 2013], the fund was insolvent. Under such circumstances, the legislature justifiably sought to limit

the number of workers eligible for fund benefits." *Cosby v. Treasurer of State*, 579 S.W.3d 202, 210 (Mo. 2019).

The 2013 amendments enacted a new § 287.220.3, which governs the liability of the Fund in cases in which a worker suffers an injury after January 1, 2014. § 287.220.3(1). In a dramatic departure from the Fund's prior operation, the 2013 amendment eliminates <u>all</u> Fund liability for claims of permanent *partial* disability. § 287.220.3(2); *see Cosby*, 579 S.W.3d at 207. The 2013 amendment also sharply limits Fund liability for permanent *total* disability. With respect to claims for permanent total disability, Subsection <u>a</u> requires that a claimant have a pre-existing disability meeting a specific statutory threshold. It provides:

> An employee [must have] a medically documented preexisting disability equaling a minimum of fifty weeks of permanent partial disability compensation according to the medical standards that are used in determining such compensation which is:
>
> > (i)      A direct result of active military duty in any branch of the United States Armed Forces; or
> >
> > (ii)      A direct result of a compensable injury as defined in section 287.020; or
> >
> > (iii)      Not a compensable injury, but such preexisting disability directly and significantly aggravates or accelerates the subsequent work-related injury and shall not include unrelated preexisting injuries or conditions that do not aggravate or accelerate the subsequent work-related injury; or
> >
> > (iv)      A preexisting permanent partial disability of an extremity, loss of eyesight in one eye, or loss of hearing in one ear, when there is a subsequent compensable work-related injury as set forth in subparagraph b of the opposite extremity, loss of eyesight in the other eye, or loss of hearing in the other ear.

§ 287.220.3(2)(a)a.

The statute then provides, in plain and unambiguous language, that the qualifying pre-existing disability must combine with the primary injury to render

2

the claimant permanently and totally disabled.  To be eligible for compensation from the Fund,

> Such employee [must] thereafter sustain[ ] a subsequent compensable work-related injury that, when combined with the preexisting disability, as set forth in items (i), (ii), (iii), or (iv) of subparagraph a. of this paragraph, results in a permanent total disability as defined under this chapter.

§ 287.220.3(2)(a)b ("Subsection _b_").

Subsection _b_ plainly requires that the primary injury must combine with _qualifying_ pre-existing disabilities to produce permanent total disability.  No _other_ pre-existing disabilities may be considered.  The statute essentially provides that the Fund is liable only when

A + B = C,

*where*
A is the primary injury
B is the qualifying pre-existing disability and
C is permanent total disability.

By specifying that the "combin[ation]" of the primary injury and the qualifying pre-existing disability must "result[ ] in a permanent total disability," the statute necessarily excludes consideration of *other* pre-existing disabilities which fail to meet the statutory criteria.  When a statute specifies that A + B must equal C, the statute is not satisfied by considering A + B + D + E.  Contrary to the majority, this construction does not require reading words of exclusion into Subsection _b_ – it merely requires that we give the words enacted by the legislature their plain and ordinary meaning.

The fact that non-qualifying pre-existing disabilities may not be considered in determining whether a claimant is permanently and totally disabled is confirmed by Subsection _a_ (iii), which specifies that qualifying disabilities "shall not include unrelated preexisting injuries or conditions that do not aggravate or accelerate the

3

subsequent work-related injury." § 287.220.3(2)(a)a(iii). Although the majority asserts that "[s]imilar restrictive language is absent from the relevant subsection at issue before us," Maj. Op. at 22, that is simply inaccurate – Subsection _b_ expressly provides that pre-existing disabilities must meet the criteria specified in Subsection _a_ (i) through (iv), which includes the exclusionary language in Subsection _a_ (iii). While the exclusion may not be repeated verbatim in Subsection _b_, it is incorporated by an explicit reference.

Subsection _b_ clearly and unambiguously requires that, in order to trigger Fund liability, a claimant must be permanently and totally disabled by operation of the primary injury, in combination with pre-existing disabilities which meet the statutory criteria. The correctness of this straightforward reading is confirmed by comparing the language of § 287.220.3, which applies to _post_-2014 injuries, with the language of § 287.220.2, which applies to _pre_-2014 injuries.

Like § 287.220.3, the third sentence of § 287.220.2 specifies certain thresholds which a pre-existing disability must satisfy in order to trigger Fund liability for a pre-2014 injury. The fourth sentence of § 287.220.2 explicitly provides, however, that in determining the claimant's total level of disability, _all_ pre-existing disabilities are considered. The statute specifies that,

> After the compensation liability of the employer for the last injury, considered alone, has been determined by an administrative law judge or the commission, the degree or percentage of employee's disability that is ***attributable to all injuries or conditions existing at the time the last injury was sustained*** shall then be determined . . . .

§ 287.220.2 (emphasis added).

The Missouri Supreme Court has read the emphasized language to mean that, with respect to pre-2014 injuries, _all_ pre-existing disabilities must be considered in determining the claimant's overall level of disability, so long as the claimant has at least one pre-existing disability satisfying the statutory threshold.

4

The statute directs the ALJ to determine the degree or percentage of disability attributable to "all injuries or conditions existing at the time the last injury was sustained." Section 287.220.1. ***The plain and ordinary meaning of this language is that all preexisting injuries, without the threshold limitation, are to be considered in calculating the amount of compensation.*** The legislature added a numerical threshold to the third sentence in section 287.220.1 for determining when the fund's liability is triggered. ***It could have added similar language to the fourth sentence to limit what can be used in computing a claimant's award, but it did not do so***. Rather, it expressly requires all injuries or conditions existing at the time of the last injury to be considered.

. . . The language plainly requires consideration of "all" injuries, which is contrary to an interpretation that "all" means all injuries that meet the thresholds. . . .

*Treasurer v. Witte*, 414 S.W.3d 455, 467 (Mo. 2013) (emphasis added); *see Calvert v. Treasurer*, 417 S.W.3d 299, 311-12 (Mo. App. S.D. 2013) (following *Witte*); *Hoven v. Treasurer*, 414 S.W.3d 676, 681-82 (Mo. App. E.D. 2013) (same).

The language at issue in *Witte* expressly required that the claimant's overall degree of disability be determined by considering "all injuries or conditions existing at the time of the last injury," once the Fund's liability had been triggered by at least one pre-existing disability which met the statutory threshold. The Supreme Court emphasized that the sentence dictating how the extent of disability was to be determined did not limit consideration to only "injuries that meet the thresholds," and did not "limit what can be used in computing a claimant's award."

Subsection <u>b</u> contains exactly the limitation which is lacking in § 287.220.2: it specifically says that the effect of the primary injury must combine with "the preexisting disability, *as set forth in items (i), (ii), (iii), or (iv) of subparagraph a. of this paragraph*." § 287.220.3(2)(a)b (emphasis added). Thus, Subsection <u>b</u> <u>does</u> "limit what can be used in computing a claimant's award," by specifying that only "injuries that meet the thresholds" may be considered.

5

The contrast between the language at issue in *Witte*, and the language of Subsection *b*, confirms that – in cases involving post-2014 injuries – the Commission must limit its consideration to only those pre-existing disabilities which meet the statutory criteria. "'When different statutory terms are used in different subsections of a statute, appellate courts presume that the legislature intended the terms to have different meaning and effect.'" *MC Devmt. Co. v. Central R-3 School Dist.*, 299 S.W.3d 600, 605 (Mo. 2009) (quoting *Nelson v. Crane*, 187 S.W.3d 868, 870 (Mo. 2006)); *accord Alberici Constructors, Inc. v. Dir. of Revenue*, 45 S.W.3d 632, 638 (Mo. 2015) (citing *State v. Moore*, 303 S.W.3d 515, 520 (Mo. 2010)).

There is *another* contrast in statutory language that is relevant here. Section 287.220.2 separately provides for Fund liability for pre-2014 permanent *total* disability claims. In that context, the statute specifies that the statutory thresholds on pre-existing disabilities found in § 287.220.2 are wholly inapplicable:

> If the previous disability or disabilities, whether from compensable injury or otherwise, and the last injury together result in total and permanent disability, **the minimum standards under this subsection** for a body as a whole injury or a major extremity injury **shall not apply** and the employer at the time of the last injury shall be liable only for the disability resulting from the last injury considered alone and of itself . . .

(Emphasis added.) *See Dierks v. Kraft Foods*, 471 S.W.3d 726, 736 (Mo. App. W.D. 2015) ("While § 287.220.1 [now § 287.220.2] contains minimum thresholds for determining whether the Fund is liable for *Permanent Partial Disability* benefits, thereby precluding *de minimus* injuries from triggering liability for that type of benefit, see *Witte*, 414 S.W.3d at 466, in the context of *Permanent Total Disability* benefits, the minimum requirements are expressly removed by the statute."). The treatment of pre-2014 claims for permanent total disability in § 287.220.2 – where the statutory thresholds on pre-existing disabilities are *completely removed* – stands

6

in sharp contrast to § 287.220.3, where the statute is explicit that the pre-existing disabilities *must* satisfy the statutory criteria.

The majority opinion rightly notes that, in determining whether a particular claimant is permanently and totally disabled, it is necessary to consider various attributes of the injured worker, such as the worker's educational level, age, work experience, and skills. The 2013 amendments did nothing to prevent the Commission from considering an individual claimant's circumstances in determining whether the claimant is permanent and totally disabled. Under the amendments, however, the Commission may not consider a claimant's pre-existing *disabilities* – namely, conditions which constituted "a hindrance or obstacle to employment"[1] prior to the primary injury – unless the pre-existing disabilities meet the statutory criteria of Subsection *a*. The 2013 amendments were plainly intended to eliminate Fund liability for pre-existing disabilities, except for disabilities which fall within one of the four categories contained in Subsection *a*.[2]

**Conclusion**

As the majority opinion finds, the Labor and Industrial Relations Commission erroneously evaluated Parker's claim against the Fund under § 287.220.2, the statutory provision applicable to pre-2014 injuries. In addition, it erroneously considered pre-existing disabilities which did not meet the criteria of Subsection *a* in determining that Parker was permanently and totally disabled. For

---

[1]     *See*, *e.g.*, *Williams v. Treasurer*, 588 S.W.3d 919, 927 (Mo. App. W.D. 2019); *Hazeltine v. Second Injury Fund*, 591 S.W.3d 45, 56 (Mo. App. E.D. 2019).

[2]     The Commission clearly viewed Parker's back and knee conditions as pre-existing *disabilities*. The Administrative Law Judge's decision (adopted by the Commission) specifically refers to Parker's "preexisting disability to his back and legs." With respect to the back injury, the ALJ specifically noted that, although "Dr. Stuckmeyer did not assign any specific disability to that condition . . ., nevertheless, I believe Employee credibly testified as to how his back condition affected him prior to the June 2014 injury and how it impacted his ability to sit, stand and walk. Dr. Stuckmeyer did opine that condition was a potential obstacle or hindrance to re-employment."

7

these reasons, I would reverse the Commission's Final Award, and remand the case to the Commission for it to determine whether Parker is entitled to Fund benefits under the appropriate legal standards.

_____
Alok Ahuja, Judge